[No. A031928. First Dist., Div. Two. Nov. 1, 1985.]

PLANNED PARENTHOOD AFFILIATES OF CALIFORNIA et al.,
Petitioners, v.
DAVID B. SWOAP, as Secretary, etc., et al., Respondents.

1188

**COUNSEL**

Jay-Allen Eisen for Petitioners.

Margaret C. Crosby, Alan L. Schlosser, Carol S. Boyk, Maria E. Stratton and Susan R. Schwartz as Amici Curiae on behalf of Petitioners.

John K. Van de Kamp, Attorney General, and Ralph M. Johnson, Deputy Attorney General, for Respondents.

Michael P. Farris, Diane E. White and Cimron Campbell as Amici Curiae on behalf of Respondents.

**OPINION**

**KLINE, P. J.**—Petitioners, a coalition of nonprofit corporations which provide comprehensive family planning services, a regional family planning council, and a low-income recipient of state family planning services, filed a writ of mandate seeking to compel respondents State Secretary of Health and Welfare David B. Swoap, Director of the State Department of Health Services Kenneth Kizer, Chief Officer of the State Office of Family Planning Frederick E. Walgenbach, State Controller Kenneth Cory, and State Treasurer Jesse M. Unruh, to refrain from enforcing section 33.35 of the Budget

Act of 1985-1986 which contains restrictive language regarding the use of family planning funds for organizations providing abortion-related services.[1]

The 1985-1986 California State Budget was introduced in the Senate as Senate Bill (SB) No. 150 and in the Assembly as Assembly Bill (AB) No. 222. On May 24, 1985, SB 150 was amended to add section 33.35; AB 222 did not include this provision. The Senate and Assembly versions of the budget were sent to a six-member conference committee composed of three members from each house. The conference committee voted to reject section 33.35 and to adopt the Assembly version of that portion of the budget which did not include section 33.35. On June 13, 1985, a two-thirds majority of both houses voted to adopt SB 150 as amended by the conference committee.

After SB 150 was enrolled and sent to the Governor, it was discovered that the bill as adopted included section 33.35. Due to staff error, there was no amendment to SB 150 reflecting the deletion of section 33.35. Members of the conference committee and the Speaker of the Assembly notified the Governor that section 33.35 was contrary to the action of the conference committee and had been left in the budget bill by mistake. The Speaker specifically requested that the Governor "delete the language in order to properly reflect the Budget as voted on by both Houses of the Legislature." On June 28, 1985, the Governor signed SB 150 into law stating that he had not deleted section 33.35, as requested, because he opposed the use of public funds to finance abortions and abortion services. On June 29, 1985, the Department of Health Services notified all agencies receiving state family planning funds that organizations "which perform, promote, or advertise abortions, or receive compensation, advantage, benefit or gain from abortion referrals" may not be eligible for reimbursement.

On July 3, 1985, petitioners filed an original petition in this court seeking mandate to bar enforcement of section 33.35. On July 10, 1985, we issued an order to show cause and stayed enforcement of section 33.35 pending the hearing.

On July 10, 1985, respondents Swoap, Kizer, and Walgenbach sent contracts for fiscal year 1985-1986 to eligible family planning agencies which

---

[1]Section 33.35 provides: "No funds appropriated for the Office of Family Planning shall be granted, directly or indirectly, to any group, clinic, or organization which performs, promotes, or advertises abortions, or which receives any direct or indirect compensation, advantage, benefit, or gain from referrals for abortion services."

included the restrictive language of section 33.35.[2] On the same day, respondent State Health Director Kizer issued a statement to such agencies regarding the implementation of section 33.35.[3] Under these guidelines, pregnancy termination procedures would be allowed where the mother's life is at risk, in cases of rape or incest, or where the procedure is incidental to, or a complication of, another treatment. Counties and the University of California would be exempt from the restrictions imposed by section 33.35.

The parties and the amici devote their attention chiefly to the issues of whether section 33.35 unconstitutionally conditions receipt of state funds on the forfeiture of fundamental constitutional rights and denies equal protection of the law.[4] It is unnecessary for us to reach these issues, however,

---

[2]Under section 17 of these contracts, each agency participating in the family service program: "represents and agrees that it is not, and that during the term of this contract, will not be, a group, clinic, or organization which performs, promotes, or advertises abortions, or which receives any direct or indirect compensation, advantage, benefit or gain from referrals for abortion services."

[3]The director's statement, which was issued in the form of a news release, provides in pertinent parts as follows: "First, with regard to the term 'abortion,' I should tell you that this will not be construed as pertaining to all pregnancy termination procedures, regardless of circumstances. Pregnancy termination procedures performed when the life of the mother is at risk or because the pregnancy was a result of rape or incest will be distinguished from elective therapeutic abortions and not included under the definition of abortion. Likewise, pregnancy termination procedures that are incidental to, or a complication of, another treatment or procedure will not be included under this term. [¶] With regard to the phrase 'group, clinic or organization,' this will be interpreted to include contractors who are individual providers or associations, as well as interlocking organizational associations between abortion performing and non-performing entities. Of note, we expect to continue to contract with counties. Counties will not be viewed as 'organizations', since counties are subdivisions of the State and are, therefore, excluded from this language. Similar reasoning applies to the University of California. [¶] With regard to the word 'performs,' this will be interpreted to mean an entity whose employees perform or assist in performing elective therapeutic abortions. This would also apply to agencies having a unit, division, subsidiary, or parent organization which performs elective therapeutic abortions, but it would not refer to an agency that merely is a member in, or affiliated with, an organization which includes abortion providers within the total membership. [¶] The word 'promotes' will be interpreted in a common sense manner. Giving abortion referral information to a client as part of the normal family planning counseling process will not be considered as promoting abortion, nor would the offering of counseling and information on therapeutic abortion as a pregnancy option. Instead, the term will be interpreted to mean taking a position advocating abortion over other pregnancy options. [¶] Similarly, the word 'advertises' will be interpreted in the common sense manner in which advertising would refer to such things as sponsoring media commercials for abortion services. Providing resource materials that list abortion providers or providing counseling about abortion as a pregnancy option, when presented as part of a comprehensive pregnancy counseling effort, will not be viewed as advertising. [¶] Lastly, the phrase 'direct or indirect compensation, advantage, benefit, or gain from referrals for abortion services' will be construed to mean the receipt of cash payments or discounts, or some other compensation in time or services, resulting from the referral. The sharing of expenses would also seem to be a logical form of compensation in this regard."

[4]We granted leave to the American Civil Liberties Union and the Women Lawyers Association of Los Angeles, to appear as amici in support of petitioners, and to the Concerned Women for America to appear as amicus in support of respondents.

because we find that section 33.35 represents an attempt by the Legislature to amend existing law in violation of the dictates of article IV, section 9, of the California Constitution.

## I.

Before addressing the state constitutional issue we deem dispositive, it is necessary to first lay to rest petitioners' unusual contention that section 33.35 should be stricken in order to effectuate the legislative intent. Emphasizing the undisputed fact that section 33.35 remained in the Budget Act solely as a result of clerical error, and relying upon the unopposed affidavits of members of each house of the Legislature who declare that the provision was voted down by a four-to-two vote in a conference committee, petitioners invoke the familiar principle of statutory construction that when the legislative intent may be ascertained it will be given effect by the courts " 'even though it may not be consistent with the strict letter of the statute.' " (*Dickey* v. *Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 802 [151 P.2d 505, 157 A.L.R. 324], quoting *In re Haines* (1925) 195 Cal. 605, 612 [234 P. 883]; *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 849, fn. 6 [59 Cal.Rptr. 609, 428 P.2d 593].) Where necessary in order to effectuate the legislative intent, the "words or phrases [of a statute] may be changed, added or *stricken out.*" (*In re Sekuguchi* (1932) 123 Cal.App. 537, 538 [11 P.2d 655], italics added.)

The difficulty with this argument is that we are not here confronted with an ambiguous statute in need of interpretation. Petitioners are not genuinely asking us to construe the words of section 33.35, but to repeal it. This we cannot do. While certain legislative reports may be indicative of legislative intent (*People* v. *Superior Court (Douglass)* (1979) 24 Cal.3d 428, 434 [155 Cal.Rptr. 704, 595 P.2d 139]), "they cannot be used to nullify the language of the statute as it was in fact enacted." (*San Mateo City School Dist.* v. *Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 863 [191 Cal.Rptr. 800, 663 P.2d 523].) Nor can the understanding of individual legislators who cast their votes in favor of a measure be used for this purpose. (*Ibid.*) The question before us is not the meaning but the *validity* of section 33.35 as an expression of the legislative will. The salutary principle has long been established in California that the judicial branch may not go behind the record evidence of a statute and inquire whether it genuinely reflects the will of the Legislature. "If an Act is properly enrolled, authenticated, and deposited with the Secretary of State, it is conclusive evidence of the legislative will at the time of its passage." (*People* v. *Burt* (1872) 43 Cal. 560, 564.)

The seminal case regarding this principle is *Sherman* v. *Story* (1866) 30 Cal. 253. The defendant in that case, who challenged the validity of a par-

ticular Act of 1866, offered legislative journals and oral testimony, all apparently uncontradicted, that certain proposed amendments that were rejected in the Assembly were nonetheless (presumably by mistake) incorporated into the act by the enrolling clerk of the Senate, "and thereby, although in fact not adopted by either House, became a part of the Act, as it now appears." (*Id.,* at p. 255.) "In other words, it is claimed to be competent to show, by the kind of evidence indicated, that the Act now appearing of record in the Office of the Secretary of State, duly authenticated by the certificates of the Secretary of the Senate and Clerk of the Assembly, the signatures of the President of the Senate and Speaker of the Assembly, and the approval of the Governor of the State, never did pass either House, and is, therefore, not a valid law." (*Id.,* at pp. 255-256.) In a lengthy opinion, the Supreme Court declined to look behind the "solemn official record" (*id.,* at p. 278), observing that "[w]hen we once depart from [this] principle—from a sound rule of law—where shall we stop? Do not the circumstances of this case open to our vision a vista of absurdities into which we shall stumble if we attempt to explore forbidden fields for evidence of a vague, shadowy and unsatisfactory character upon which to overthrow the enrolled statutes of the land?" (*Id.,* at p. 279.)

*Sherman* v. *Story* was subsequently reaffirmed in *County of Yolo* v. *Colgan* (1901) 132 Cal. 265 [64 P. 403], which is also pertinent to the case at hand. In *County of Yolo* the journal of the Senate showed that the vote on the statute in question was "ayes, twenty, noes, three"; though the number of aye votes necessary for Senate enactment of the bill was twenty-one. The appellant contended that the measure never became law "because it did not receive, in the senate, the number of votes required by the constitutional provision that 'no bill shall become a law without the concurrence of a majority of the members elected to each house.'" (*Id.,* at p. 267.) After assaying the relevant case law, the court rejected this claim, observing, inter alia, that "[t]he law-making power of the state is vested, by the constitution, in the legislature; and while the constitution has prescribed the formalities to be observed in the passage of bills and the creation of statutes, the power to determine whether these formalities have been complied with is necessarily vested in the legislature itself, since, if it were not, it would be powerless to enact a statute. The constitution has not provided that this essential power thus vested in the legislature shall be subject to review by the courts, while it has expressly provided that no person charged with the exercise of powers properly belonging to one of the three departments—the legislative, executive, and judicial—into which the powers of the government are divided, shall exercise any functions appertaining to either of the others." (*Id.,* at pp. 274-275.)[5]

---

[5]As pointed out in *Sherman* v. *Story, supra,* 30 Cal. 253, if any "inconvenience" results

Since the irregularity relied upon by petitioners is not apparent from a reading of the budget bill as enacted, and can be established only through extrinsic evidence, this case is not within the exception to the rule of *Sherman* v. *Story* which permits judicial inquiry if the irregularity in legislative proceedings appears *on the face* of the challenged measure. (*People* v. *County of Santa Clara* (1951) 37 Cal.2d 335, 338-340 [231 P.2d 826]; *People* v. *City of San Buenaventura* (1931) 213 Cal. 637, 642 [3 P.2d 3].)

We note, finally, that if, as appears to have been the case, section 33.35 was enacted by mistake, it is not the first time this has occurred in connection with the annual budget bill, a complex measure invariably enacted in exigent circumstances involving, among other constraints, a constitutionally mandated time restriction. (Cal. Const., art. IV, § 12, subd. (c). ["The Legislature shall pass the budget bill by midnight on June 15 of each year."]) As the Attorney General correctly points out, the mistakes that inevitably occur in the budget bill are ordinarily corrected by the Legislature in the form of a "cleanup" bill. (See, e.g., Stats. 1981, ch. 169, § 45, which was enacted "[i]n order to correct technical errors in the Budget Bill of 1981 . . . and to more accurately effect the intention of the Conference Committee. . . ." (*Ibid.*) A cleanup bill to repeal section 33.35 (Sen. Bill No. 1469) was introduced in the Senate on June 20, 1985, and presumably will be acted upon in due course. In any event, from all that appears, the Legislature, which has not sought our intervention, possesses the ability to correct its mistakes without judicial assistance.

Accordingly, we hold that section 33.35 of the Budget Act of 1985-1986, which has received the necessary approval of each house of the Legislature and has been duly enrolled and approved by the Governor, cannot be impeached by extrinsic evidence that it does not genuinely reflect the will of the Legislature.

II.

■ The necessary judicial assumption that section 33.35 is a valid reflection of the will of the Legislature does not, of course, immunize that provision from constitutional scrutiny. Among the applicable state constitutional requirements claimed here to be infringed is the so-called single subject rule of article IV, section 9, which declares that: "A statute shall embrace but one subject, which shall be expressed in its title. If a statute

---

from application of this rule, "the Legislature is the proper body to provide a remedy. It can guard by proper restrictive provisions against other and greater inconveniences by designating the cases in which, and the circumstances and limitations under which an enrolled statute may be impeached. It may limit the time within which the impeachment must be made, and the character of the evidence which may be introduced." (*Id.*, at p. 279.)

embraces a subject not expressed in its title, only the part not expressed is void. A statute may not be amended by reference to its title. A section of a statute may not be amended unless the section is re-enacted as amended."[6]

■ This provision, which has ancient roots[7] and exists in one form or another in the constitutions of most of our sister states,[8] has two purposes. One of its functions "is to prevent legislators and the public from being entrapped by misleading titles to bills whereby legislation relating to one subject might be obtained under the title of another." (*Abeel* v. *Clark* (1890) 84 Cal. 226, 228 [24 P. 383]; *Ex parte Liddell* (1892) 93 Cal. 633, 636 [29 P. 251]; *Matter of Maginnis* (1912) 162 Cal. 200, 203 [121 P. 723]; *Heron* v. *Riley* (1930) 209 Cal. 507, 510 [289 P. 160]; *People* v. *Superior Court* (1937) 10 Cal.2d 288, 293 [73 P.2d 1221].) But prevention of the passage of acts bearing misleading titles is not the principal purpose of the one subject rule. As has been stated, "[t]he primary and universally recognized purpose . . . is to prevent log-rolling in the enactment of laws . . . ." (Ruud, *"No Law Shall Embrace More Than One Subject"* (1958) 42 Minn.L.Rev. 389, 391.) As our Supreme Court has pointed out, "[i]n times past an abuse had grown up, which consisted in attaching to a bill dealing with one matter of legislation a clause entirely foreign to that subject matter, to the end that, hidden under the cloak of the meritorious legislation, the obnoxious measure might 'ride through.' Such 'riders,' as they came to be designated, not infrequently embraced ill-digested and pernicious legislation, relief bills, private appropriation measures, and the like, which would not have carried if the legislative mind had been directed to them. It was to cure this evil that the constitution made it mandatory that a bill should embrace but one subject-matter, and to meet the case of such a 'rider' actually slipping through, declared that any matter foreign to the title of the bill should be held void." (*Ex parte Hallawell* (1909) 155 Cal. 112, 114 [99 P. 490]; see also *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 251 [186 Cal.Rptr. 30, 651 P.2d 274]; 1A Sutherland, *op. cit. supra,* § 17.01, p. 2 and cases there cited; Luce, Legislative Procedure, *supra,* at pp. 548-552.)

■ In order to minimize judicial interference in the activities of the legislative branch, the single subject rule is to be construed liberally. "How-

---

[6]In its present form, article IV, section 9, was added on November 8, 1966. It derives, however, from article IV, § 25 and article XI, section 21, of the original California Constitution of 1849, and from former section 24 of article IV, adopted in 1879.

[7]The *Lex Caecilia Didia*, enacted by the Romans in 98 B.C., prohibited the *lex satura*, a bill containing unrelated provisions. (See Luce, Legislative Procedure (1922) p. 548.)

[8]As reported in 1982, 41 state constitutions provide that an act shall not embrace more than one subject or object. (1A Sutherland, Statutory Construction (4th ed., 1985 rev.) § 17.01, p. 1. The only states that have no such provision are Arkansas, Connecticut, Maine, Massachusetts, Mississippi, New Hampshire, North Carolina, Rhode Island and Vermont. (*Id.,* p. 3, fn. 2.)

ever numerous the provisions of an act may be, if they can be fairly considered as falling within the subject-matter of legislation, or as proper methods for the attainment of the end sought by the act, there is no conflict with the constitutional provision. . . ." (*Ex parte Kohler* (1887) 74 Cal. 38, 41 [15 P. 436]; *Matter of Maginnis, supra,* 162 Cal. 200, 204.) In other words, the rule "was not designed as a loophole of escape from, or a means for the destruction of, legitimate legislation." (*Heron* v. *Riley, supra,* 209 Cal. 507, 510.) Accordingly, a provision is deemed germane for purposes of the single subject rule if it is "auxiliary to and promotive of the main purpose of the act or has a necessary and natural connection with that purpose . . . ." (*Metropolitan Water Dist.* v. *Marquardt* (1963) 59 Cal.2d 159, 172-173 [28 Cal.Rptr. 724, 379 P.2d 28].)[9]

 The main purpose of the annual budget bill is that of "itemizing recommended expenditures" for the ensuing fiscal year. (Cal. Const., art. IV, § 12, subd. (c).)[10] As provided in our Constitution, "[n]o bill except

---

[9]The single subject rule pertinent to legislation set forth in article IV, section 9, is analogous to the corresponding prescription, elsewhere set forth in our Constitution, that "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect." (Art. II, § 8, subd. (d).) In determining whether such a measure " 'embrac[es] more than one subject' " our Supreme Court has held that " 'an initiative measure does not violate the single-subject requirement if, despite its varied collateral effects, *all of its parts are "reasonably germane"* to each other' and to the general purpose or object of the initiative." (*Brosnahan* v. *Brown, supra,* 32 Cal.3d 236, 245, italics in original, quoting *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 230 [149 Cal.Rptr. 239, 583 P.2d 1281]; see *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 38-39 [157 Cal.Rptr. 855, 599 P.2d 46]; *Perry* v. *Jordan* (1949) 34 Cal.2d 87, 90-92 [207 P.2d 47].)

The definitive treatise on the application of the single subject rule to initiative measures in this state is Lowenstein, *California Initiatives and the Single-Subject Rule* (1983) 30 UCLA L.Rev. 936, which contains a thorough discussion of the "reasonably germane" test.

[10]Article IV, section 12, provides in its entirety as follows: "(a) Within the first 10 days of each calendar year, the Governor shall submit to the Legislature, with an explanatory message, a budget for the ensuing fiscal year containing itemized statements for recommended state expenditures and estimated state revenues. If recommended expenditures exceed estimated revenues, the Governor shall recommend the sources from which the additional revenues should be provided.

"(b) The Governor and the Governor-elect may require a state agency, officer or employee to furnish whatever information is deemed necessary to prepare the budget.

"(c) The budget shall be accompanied by a budget bill recommended for expenditures. The bill shall be introduced immediately in each house by the persons chairing the committees that consider appropriations. The Legislature shall pass the budget bill by midnight on June 15 of each year. Until the budget bill has been enacted, the Legislature shall not send to the Governor for consideration any bill appropriating funds for expenditure during the fiscal year for which the budget bill is to be enacted, except emergency bills recommended by the Governor or appropriations for the salaries and expenses of the Legislature.

"(d) No bill except the budget bill may contain more than one item of appropriation, and that for one certain, expressed purpose. Appropriations from the General Fund of the State, except appropriations for the public schools, are void unless passed in each house by rollcall vote entered in the journal, two thirds of the membership concurring.

"(e) The Legislature may control the submission, approval, and enforcement of budgets and the filing of claims for all State agencies."

the budget bill may contain more than one item of appropriation, and that for one certain, expressed purpose." (Art. IV, § 12, subd. (d).) ▮ A legislative "appropriation" has been judicially defined as one "by which a named sum of money has been set apart in the treasury and devoted to the payment of a particular claim or demand." (*Stratton* v. *Green* (1872) 45 Cal. 149, 151; *Wood* v. *Riley* (1923) 192 Cal. 293, 303 [219 P. 966].)

▮ The title of the Budget Act of 1985-1986, which pursuant to article IV, section 9, defines the "subject" to which the substance of section 33.35 must be germane, is: "An act making appropriations for the support of the government of the State of California and for several public purposes in accordance with the provisions of Section 12 of Article IV of the Constitution of the State of California, and declaring the urgency thereof, to take effect immediately." (Stats. 1985, ch. 111.)

Respondents contend that section 33.35 does not violate the single subject rule because "the Legislature may control enforcement of budgets through the Budget Act, and item 33.35 is clearly worded to maintain the integrity of the separate budget allocations for planning and abortion." Respondents also maintain that section 33.35 does not amend existing law and is totally consistent with Welfare and Institutions Code section 14500 et seq., the statutory basis for the family planning program. Respondents state that section 33.35 "simply clarifies the separation between funding for abortions and the funding for [family] planning."

While it is true, as we have said, that the single subject rule is to be construed liberally to uphold proper legislation, it is also true, and courts must keep in mind, that the annual budget bill is particularly susceptible to abuse of that rule. "History tells us that the general appropriation bill presents a special temptation for the attachment of riders. It is a necessary and often popular bill which is certain of passage. If a rider can be attached to it, the rider can be adopted on the merits of the general appropriation bill without having to depend on its own merits for adoption." (Ruud, *"No Law Shall Embrace More Than One Subject,"* supra, 42 Minn.L.Rev. at p. 413.)

In California, legislators and state agencies have repeatedly been reminded by the Attorney General that "[a]nnual budget acts, like all other enactments of the Legislature, are subject to the provisions of section [9], Article IV, of the California Constitution," which sets forth the single subject rule. (29 Ops.Cal.Atty.Gen. 161, 167 (1957); accord 27 Ops.Cal.Atty.Gen. 111, 113 (1956); 27 Ops.Cal.Atty.Gen. 345, 346 (1956); 39 Ops.Cal.Atty.Gen. 200, 204 (1962); 64 Ops.Cal.Atty.Gen. 910, 917 (1981).) ▮ Quoting with approval from one of these opinions, our Supreme Court recently

agreed that " ' ' "the budget bill may deal only with the one subject of appropriations to support the annual budget," ' ' and thus ' "may not constitutionally be used to grant authority to a state agency that the agency does not otherwise possess" ' or to ' "substantively amend[ ] and chang[e] [e]xisting statute law." ' " (*Association for Retarded Citizens* v. *Department of Developmental Services* (1985) 38 Cal.3d 384, 394 [211 Cal.Rptr. 758, 696 P.2d 150], quoting 64 Ops.Cal.Atty.Gen. 910, 917 (1981).)

■ An amendment has been described as " 'a legislative act designed to change some prior or existing law by adding or taking from it some particular provision.' " (*Franchise Tax Bd.* v. *Cory* (1978) 80 Cal.App.3d 772, 777 [145 Cal.Rptr. 819], quoting *Assets Reconstruction Corp.* v. *Munson* (1947) 81 Cal.App.2d 363, 368 [184 P.2d 11].) " 'Whether an act is amendatory of existing law is determined not by title alone, or by declarations in the new act that *it purports to amend* existing law. On the contrary, it is determined by an examination and comparison of its provisions with existing law. If its aim is to clarify or correct uncertainties which arose from the enforcement of the existing law, or to reach situations which were not covered by the original statute, the act is amendatory, *even though in its wording* it does not purport to amend the language of the prior act.' " (Italics in original.) (*Id.,* at p. 777, quoting *Balian Ice Cream* v. *Arden Farms Co.* (S.D.Cal. 1950) 94 F.Supp. 796, 798-799.)

■ In *Franchise Tax Bd.* v. *Cory, supra,* 80 Cal.App.3d 772, the Legislature sought by "control language" in the budget bill to clarify and restrict the auditing and sampling methods to be used in connection with appropriations for audits by the Franchise Tax Board of political candidates' financial reports. The Governor "item vetoed" this control language but not the appropriation. The Legislature then urged the state Controller not to allow use of the funds appropriated in a manner contrary to the control language. The court held that the control language was an invalid attempt to amend the Political Reform Act (Gov. Code, § 9000 et seq.) without compliance with the initiative amendment procedures required by Government Code section 81012, subdivision (a). In reaching its decision the court noted that, although the audit provisions of the act did not by their terms conflict with the control language, the latter added to the act by clarifying the standards to be used and by significantly restricting the manner of conducting audits. As such the control language undertook to amend the act and was invalid.

Guided in our reasoning by this analysis, we find that section 33.35 amends existing provisions of the family planning act (Welf. & Inst. Code, § 14500 et seq.) and therefore violates the single subject rule.

A major purpose of the family planning act is "[t]o make available to citizens of the state of childbearing age *comprehensive medical knowledge,* assistance and services relating to the planning of families." (Welf. & Inst. Code, § 14501, subd. (a), italics added.) In furtherance of this purpose, the Office of Family Planning is required, among other things, "to establish in each county a viable program for the dispensation of family planning, infertility and *birth control information and techniques*" (*id.,* § 14501, subd. (f), italics added) to pursue "scientific investigation into . . . existing and new . . . *birth control techniques*" (*id.,* § 14501, subd. (g), italics added); and to establish education and training programs for health care practitioners "in rendering advice on . . . *birth control techniques and information.*" (*Id.,* § 14501, subd. (h), italics added.) The Office of Family Planning is also directed to "enter into contracts and agreements with individuals, colleges, universities, associations, corporations, municipalities and other units of government . . . which may provide for payment by the state within the limit of funds available for material, equipment and services." (*Id.,* § 14501, subd. (i).)

██ ██ "Birth control," as that term is used in the family planning act, clearly includes abortion. Regulations implementing that act that were recently issued by the Office of Family Planning provide that agencies funded under the act must provide each of their clients family planning information "that enables her or him to make informed decisions based on full knowledge of *all possible options.*" (Dept. of Health Services, Office of Family Planning, Guidebook for Family Planning Agencies (July 1, 1985) § 4, par. B., p. A.1.8, italics added.) The regulations specifically instruct that in providing "pregnancy counselling and referral" under the family planning act, "[a]ll applicable alternatives (prenatal care, adoption, infertility care, *pregnancy termination,* contraception) must be presented in an unbiased manner" (*id.,* § 5, par. C., subd. 5b(1), p. A.1.16, italics added), so that the client understands "the advantages" as well as "the disadvantages" of her alternatives. (*Id.,* § 5, par. C., subd. 5b(1)(b), p. A.1.17.) Moreover, section 14503 states that "Family planning services shall include, but not be limited to: (a) Medical treatment and procedures defined as family planning services under the published Medi-Cal scope of benefits." (Welf. & Inst. Code, § 14503.) It is undisputed that abortions performed by a physician, whether in a hospital, clinic, or office, are medical services funded under the California Medi-Cal program. (*Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 258 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118].)

Even if we were to agree with respondents that section 33.35 "simply clarifies" funding arrangements for abortion and other services authorized under the family planning act we would nonetheless be compelled to con-

clude that it impermissibly amends that act within the meaning of the single subject rule; for, as stated in *Franchise Tax Bd.* v. *Cory, supra,* 80 Cal.App.3d 772, an act is amendatory " '[i]f its aim is to *clarify* or correct uncertainties which arose from the enforcement of the existing law, or to reach situations which were not covered by the original statute, . . .' " (*Id.,* at p. 777, italics added.) But section 33.35, construed objectively, does not simply clarify the family planning act; quite the contrary, its prohibition on the granting of family planning funds "to any group, clinic, or organization which performs, promotes, or advertises abortions" is a manifest restriction of activities authorized under the family planning act. At the very least, section 33.35 imposes substantive conditions that nowhere appear in existing law.[11]

Because section 33.35 of the Budget Act of 1985-1986 grants authority to a state agency that the agency does not otherwise possess, and in this manner amends the family planning act, said section violates the single subject rule of article IV, section 9, of the California Constitution and is invalid.

The foregoing conclusion makes it unnecessary to discuss the other constitutional objections urged upon us with great force by petitioners.

---

[11]Respondents suggest that the Department of Health Services' interpretation of section 33.35, set forth, *ante,* at footnote 3, sufficiently narrows the provision that it does not conflict with existing rights under the family planning act or with constitutional rights. This suggestion is untenable for a variety of reasons.

First of all, as respondents implicitly concede, section 33.35 lends itself to a number of unconstitutional applications. Statutes of this sort, because they are devoid of narrow, definite and objective standards to guide the otherwise uncontrolled will of responsible governmental officials, have been held unconstitutional. (See, e.g., *Shuttlesworth* v. *Birmingham* (1969) 394 U.S. 147, 151 [22 L.Ed.2d 162, 167, 89 S.Ct. 935]; *Dillon* v. *Municipal Court* (1971) 4 Cal.3d 860, 866-867 [94 Cal.Rptr. 777, 484 P.2d 945].)

However, putting aside this substantial constitutional problem, the administrative interpretation in question clearly constitutes a "regulation" within the meaning of Government Code section 11342, subdivision (b), and, because it was admittedly not adopted under the Administrative Procedures Act rulemaking procedures, is invalid. (Gov. Code, § 11347.5; *Goleta Valley Community Hospital* v. *Department of Health Services* (1983) 149 Cal.App.3d 1124 [197 Cal.Rptr. 294]; *California Medical Assn.* v. *Brian* (1973) 30 Cal.App.3d 637 [106 Cal.Rptr. 555]; *California Assn. of Nursing Homes etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800 [84 Cal.Rptr. 590].)

Additionally, even if the administrative interpretation had been validly promulgated and could be considered it still would not save section 33.35 under the single subject rule because it prohibits family planning agencies which themselves perform abortions from receiving state funds otherwise available under the family planning act.

Finally, by construing the phrase "group, clinic or organization" not to include agencies operated by counties or by the University of California (see *ante,* fn. 3), the regulation, like the statute it purports to save, presents a substantial constitutional problem under the equal protection clause. (*Planned Parenthood of Minn.* v. *State of Minn.* (8th Cir. 1980) 612 F.2d 359, affd. 458 U.S. 901 [65 L.Ed.2d 1131, 100 S.Ct. 3039].)

Petitioners are entitled to recover their costs in these proceedings, including reasonable attorneys' fees pursuant to Code of Civil Procedure section 1021.5. (*Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d at pp. 285-286.) Because this matter commenced as an original proceeding in this court we are unable to follow the ordinary practice of remanding the request for fees to the court in which the trial was held for the purpose of taking evidence on, and fixing, the reasonable amount of fees to be awarded. (See, e.g., *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 50 [141 Cal.Rptr. 315, 569 P.2d 1303].) Nor is a case closely related to this one still pending before any trial court in this appellate district. (See *Committee to Defend Reproductive Rights* v. *Cory* (1982) 132 Cal.App.3d 852, 859 [183 Cal.Rptr. 475]; *Committee to Defend Reproductive Rights* v. *Rank* (1984) 151 Cal.App.3d 83, 88 [198 Cal.Rptr. 630].) Therefore, unless the parties are able to agree within 30 days as to the appropriate amount of costs and fees, the matter may be submitted to this court on affidavits. (*Choudhry* v. *Free* (1976) 17 Cal.3d 660, 669 [131 Cal.Rptr. 654, 552 P.2d 438].)[12]

A peremptory writ shall issue, directing respondents to refrain from enforcing the unconstitutional provisions of the Budget Act of 1985-1986 challenged herein.

Rouse, J., and Smith, J., concurred.

A petition for a rehearing was denied November 27, 1985.

---

[12]Petitioners note that the Budget Act of 1985-1986 contains a provision limiting attorneys' fees under Code of Civil Procedure section 1021.5 to a maximum of $90 an hour and $100,000 per case and contend that this restriction also violates the single subject rule. This claim is premature. "[W]e are called upon only to determine petitioners' entitlement to an award of reasonable attorneys' fees and need not anticipate collection problems which may or may not materialize." (*Committee to Defend Reproductive Rights* v. *Cory, supra,* 132 Cal.App.3d at p. 859.)