BENGZON *v.* SECRETARY OF JUSTICE OF THE
PHILIPPINE ISLANDS ET AL.

No. 214.   Argued December 18, 1936.—Decided January 4, 1937.

*Mr. Pedro Y. Ylagan* submitted for petitioner. .

*Mr. Eugene M. Caffey,* with whom *Mr. Lowell W. Bassett* was on the brief, for respondents.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

This suit was brought by petitioner against respondents in the Court of First Instance of Manila, for a writ of mandamus commanding respondents to approve and order payment of a gratuity awarded to him by § 7 of the Retirement Gratuity Law (Act 4051, Laws of the Philippines), notwithstanding the veto of that section by the Governor-General. The Court of First Instance, upon respondents' demurrer, dismissed the action. Upon appeal, the Supreme Court of the Commonwealth of the Philippines affirmed that decision, holding that the veto by the Governor-General of § 7 was authorized by § 19 of the Organic Act of August 29, 1916, 39 Stat. 545, 551. Because of the importance of the question, we granted certiorari.

The Retirement Gratuity Law contains twelve sections. It is entitled, "An Act to provide for the payment of retirement gratuities to officers and employees of the Insular Government retired from the service as a result of the reorganization or reduction of personnel thereof, including the justices of the peace who must relinquish office in accordance with the provisions of Act numbered Thirty-eight Hundred and Ninety-nine, and for other purposes."

Section 1 classifies the officers and employees, separated or retired from the service, who shall be entitled to a gratuity, and provides a method for ascertaining the amount. Section 2 accords preferences in the case of certain officers and employees; § 3 fixes the basis for the computation of the gratuity; § 4 allows an officer or employee to choose between the gratuity granted by the act and

gratuities conferred by other acts; § 5 provides for succession in respect of unpaid gratuities in case of death; and § 6 authorizes a conditional reappointment of persons separated or retired under the act.

Section 8—passing for the present § 7—abolishes the offices and positions vacated by the separation or retirement of officers and employees, with certain exceptions. Section 9 excepts from the benefits of the act designated officers and employees. Section 10 provides, "The necessary sum to carry out the purposes of this Act is hereby appropriated out of any funds in the Insular Treasury not otherwise appropriated." Section 11 fixes the effective date of the act; and § 12 provides that if any provision of the act be disapproved by the Governor-General or be held unconstitutional or invalid by a competent court, none of the other sections or provisions of the act shall be affected thereby.

The Governor-General returned the act with the endorsement, "Approved, section 7 excepted, February 21, 1933." Section 7, thus vetoed, reads:

"The Justices of the Peace who must relinquish office during the year nineteen hundred and thirty-three in accordance with the provisions of Act Numbered Thirty-eight hundred and ninety-nine, shall also be entitled to the gratuities provided for in this Act."

Section 19 of the Organic Act, *supra,* confers upon the Governor-General the usual and general veto power. That is to say, it authorizes him, if he does not approve a bill or joint resolution passed by both houses of the legislature, to "return it with his objections to that house in which it shall have originated"; and it then can become law only if upon reconsideration two-thirds of the members elected to each house shall agree to pass it. This general power requires the veto to include the whole bill. But the section contains an exception, namely—

"The Governor General shall have the power to veto any particular item or items of an appropriation bill, but

the veto shall not affect the item or items to which he does not object."

This exceptional power, it will be seen, is limited to appropriation bills; any other kind of legislation being controlled by the general rule. And its exercise is restricted to the disapproval of a particular item or particular items of such a bill. The precise question for consideration, therefore, is—did the bill which became Act 4051 constitute an appropriation bill; and, if so, was § 7, within the meaning of the foregoing provision of the Organic Act, an item of such bill?

It first is to be observed that the title of the act in no wise suggests that what follows is an appropriation bill; and an examination of the act itself discloses that, with the exception of § 10, the bill itself proposed only general legislation. Eliminating § 10, the remaining eleven sections could stand as a generic act of legislation, leaving the specific matter of appropriation to be dealt with by later enactment. The term "appropriation act" obviously would not include an act of general legislation; and a bill proposing such an act is not converted into an appropriation bill simply because it has had engrafted upon it a section making an appropriation. An appropriation bill is one the primary and specific aim of which is to make appropriations of money from the public treasury. To say otherwise would be to confuse an appropriation bill proposing sundry appropriations of money with a bill proposing sundry provisions of general law and carrying an appropriation as an incident. The Supreme Court of Texas in *Fulmore* v. *Lane,* 104 Tex. 499, 512; 140 S. W. 405, 1082, clearly pointed out the distinction between the veto power in respect of a bill in the general sense and an appropriation bill. "Nowhere in the Constitution," the court said, "is the authority given the Governor to approve in part and disapprove in part a bill. The only additional authority to disapproving a bill in whole is

that given to object to an item or items where a bill contains several items of appropriation. It follows conclusively that where the veto power is attempted to be exercised to object to a paragraph or portion of a bill other than an item or items, or to language qualifying an appropriation or directing the method of its uses, he exceeds the constitutional authority vested in him, and his objection to such paragraph, or portion of a bill, or language qualifying an appropriation, or directing the method of its use, becomes non-effective."

If the Governor-General had power under the foregoing clause of § 19 of the Organic Act to veto § 7 of the gratuities bill, he had like power to veto § 2, granting preferences to certain classes of officers and employees; or § 4, allowing a choice between the gratuity granted by the act under review and a gratuity granted by some other act; or § 5, according a right of succession to unpaid gratuities in case of death; or § 6, providing for conditional reappointment of persons separated or retired under the act; or to veto as many of them as he saw fit. No more than any of the designated sections, does § 7 constitute an item of appropriation. All of them are distinct parts of an act of general legislation. The elimination of any by an exercise of the veto power, with the going into effect of the remaining portions of the bill as a consequence (if the veto be not overruled by a two-thirds vote of each house), would result in the enactment of a general law in an emasculated form not intended by the legislature and against the will, perhaps, of a majority of each house. This would not be negation of an item or items of appropriation by veto but, in effect, affirmative legislation by executive edict.

So, even if it be conceded that the bill could be characterized as an appropriation bill, § 7 is not an "item" within the meaning of § 19 of the Organic Act. An item of an appropriation bill obviously means an item which in itself is a specific appropriation of money, not some gen-

eral provision of law which happens to be put into an appropriation bill. Provisions granting power to the executive to veto an item or items of an appropriation bill are to be found, in various forms of expression, in many of the state constitutions. Their object is to safeguard the public treasury against the pernicious effect of what is called "log-rolling"—by which, in order to secure the requisite majority to carry necessary and proper items of appropriation, unnecessary or even indefensible items are sometimes included.

Section 73 of the Constitution of Mississippi provides that the Governor may veto parts of any appropriation bill; and although "parts" would seem to be a word of wider application than the words "item or items," the Supreme Court of that state, *State* v. *Holder*, 76 Miss. 158, 180–181; 23 So. 643, held that it was not designed to enable the Governor to veto legislation carried in an appropriation bill. "Section 73," the court said, "was framed with a view of guarding against the evils of omnibus appropriation bills, securing unrighteous support from diverse interests, and to enable the governor to approve and make law some appropriations, and to put others to the test of securing a two-thirds vote of the legislature as the condition of becoming law. Thus viewed, section 73 is eminently wise, and will prove useful in practice as corrective of an evil, but if a single bill, making one whole of its constituent parts, 'fitly jointed together,' and all necessary in legislative contemplation, may be dissevered by the governor, and certain parts torn from their connection may be approved, and thereby become law, while the other parts, unable to secure a two-thirds vote in both houses, will not be law, we shall have a condition of things never contemplated, and appalling in its possible consequences."

The court below attached importance to § 12 of the act under review, which provides that if any section or pro-

vision of the act *be disapproved by the Governor-General* or held to be unconstitutional or invalid by a competent court, none of the other sections or provisions should be affected thereby. That court viewed the italicized clause of this provision as indicating that the legislature intended the act "to be an appropriation measure with various items," since it anticipated the possibility of a partial veto. Just why this clause was inserted by the legislature does not appear. It may have been merely formal, or inserted out of abundance of caution. Certainly it could not have such force as to convert what plainly was a proffer of general legislation into an appropriation bill. Although the title is only a formal part of an act, and may be resorted to as an aid to the meaning of a statute only in cases of doubt, *Hadden* v. *Collector,* 5 Wall. 107, 110, the title of the present act, at least, has the effect of overcoming such extrinsic aid as the clause relied upon otherwise might afford to the construction of the act by the court below. If the Philippine Legislature regarded the bill as an appropriation bill, it is strange that the words by which that body described and characterized its own proposed act afford no hint to that effect. Compare *Holy Trinity Church* v. *United States,* 143 U. S. 457, 462–463.

We conclude that the Governor-General was without power to separately veto § 7 of the Retirement Gratuities Act. The judgment of the lower court must be reversed, and the cause remanded for further proceedings not inconsistent with the foregoing opinion.

*Reversed.*

Mr. Justice Stone took no part in the consideration or decision of this case.