[S. F. No. 24837. Oct 13, 1987.]

JOYCE HARBOR et al., Petitioners, v.
GEORGE DEUKMEJIAN, as Governor, etc., et al., Respondents.

COUNSEL

Sarah E. Kurtz, Peter H. Reid, Tricia Berke Vinson, Casey S. McKeever and Grace Galligher for Petitioners.

Bion M. Gregory, Jack I. Horton, James L. Ashford and Mark Franklin Terry as Amici Curiae on behalf of Petitioners.

John K. Van de Kamp, Attorney General, Richard D. Martland, Chief Assistant Attorney General, N. Eugene Hill, Assistant Attorney General, Harold W. Teasdale, Mary C. Michel and Robert E. Murphy, Deputy Attorneys General, for Respondents.

OPINION

MOSK, J.—In this case, we consider two issues of constitutional significance. The first relates to the limitation imposed by article IV, section 10 of the California Constitution on the Governor's power to veto legislation,[1] and the second to the limitations placed on the Legislature by California Constitution, article IV, section 9, which provides that a "statute shall embrace but one subject, which shall be expressed in its title."[2]

On June 15, 1984, the Legislature enacted a budget for the 1984-1985 fiscal year (Budget Act). (Stats. 1984, ch. 258, p. 874 et seq.) One item of the budget (5180-101-001(a), sched. 10.04.005) was an appropriation for aid to families with dependent children (AFDC) for over $1.5 billion.

Ten days later, the Legislature passed Senate Bill No. 1379 (Stats. 1984, ch. 268, p. 1302 et seq.; hereinafter Bill 1379). Bill 1379, according to its title, related to "fiscal affairs, making an appropriation therefor." It was not to become operative unless the Budget Act was also passed (id., § 70, p. 1407) and it was declared to be an urgency measure because it would

---

[1] Section 10 provides in part: "(a) Each bill passed by the Legislature shall be presented to the Governor. It becomes a statute if it is signed by the Governor. The Governor may veto it by returning it with any objections to the house of origin, which shall enter the objections in the journal and proceed to reconsider it. If each house then passes the bill by rollcall vote entered in the journal, two thirds of the membership concurring, it becomes a statute. . . . [¶] (b) The Governor may reduce or eliminate one or more items of appropriation while approving other portions of a bill. The Governor shall append to the bill a statement of the items reduced or eliminated with the reasons for the action. The Governor shall transmit to the house originating the bill a copy of the statement and reasons. Items reduced or eliminated shall be separately reconsidered and may be passed over the Governor's veto in the same manner as bills."

[2] The second sentence of section 9 provides: "If a statute embraces a subject not expressed in its title, only the part not expressed is void."

provide "necessary statutory adjustments to implement" the Budget Act (*id.*, § 71, p. 1407).

Bill 1379 contains 71 sections enacting, amending, and repealing numerous provisions in numerous codes. Among these is section 45.5 of Bill 1379 (hereafter section 45.5), which amends section 11056 of the Welfare and Institutions Code to allow AFDC benefits to be paid under certain circumstances from the time application for such benefits is made rather than from the date the application is processed by the State Department of Social Services (department), as was the case before the amendment. The director of the department is required by the section to adopt regulations to implement its provisions within 30 days after enactment of Bill 1379. (Stats 1984, ch. 268, § 45.5, p. 1383.)

In approving the budget, the Governor reduced the item containing the AFDC allotment by $9,776,000. (Stats. 1984, ch. 258, item. 5180-101-001, sched. 10.04.005, p. 847.) In his message relating to the reduction, the Governor stated that this sum was an "augmentation" to the item for AFDC "that would have reversed current State policy and regulations regarding the effective date of the first . . . [AFDC] aid payment." (*Id.*)[3]

Two days later, he approved Bill 1379, but purported to veto section 45.5. (Stats. 1984, ch. 268, p. 1304.) His explanation for the veto was as follows: "I have made a number of reductions in appropriations and sections contained in the Budget Act. In order to fully implement my actions, I must also make conforming changes in this bill. . . . I have reduced . . . [the AFDC appropriation in the Budget Act] by $9,776,000 . . . to maintain current policies regarding the effective date of aid. . . . The elimination of this section conforms to my actions on the Budget." (*Ibid.*)

The director of the department refused to adopt regulations to implement section 45.5, as required therein, on the ground that the Governor's veto of the section was valid. Thereafter, three individuals who had applied for AFDC grants toward the end of August or the beginning of September 1984, and who claimed they had lost benefits due to the department's failure to implement section 45.5, and a coalition of welfare rights organizations, filed a petition for a writ of mandate. They sought to compel the director to adopt regulations to implement section 45.5 and to recompute the amount of benefits due all AFDC recipients whose applications were pending on July 1, 1984, and thereafter in accordance with the section.[4]

---

[3] The Governor also reduced item 5180-101-866 by $10,385,000 which represented the amount of federal funds lost to California as a result of the Governor's action "to correspond" with the reduction in the item above. (*Id.* at p. 848.)

[4] The individual petitioners filed both in their individual capacities as AFDC recipients and as taxpayers under section 526a of the Code of Civil Procedure.

The petition asserted that the Governor's veto was ineffective because his veto power did not extend to disapproving parts of bills which were not appropriation measures, and that section 45.5 was not such a measure. Petitioners joined in the action the Governor, the director of the department, and the Department of Finance and its director. The petition was initially filed in the Court of Appeal, which denied it without opinion. We granted a hearing from the denial and retransferred the matter to that court with directions to issue an alternative writ. The court's opinion following issuance of the writ supported the position of respondents. The Court of Appeal denied a peremptory writ and we granted review.

### Validity of the Governor's Veto

The California Constitution declares that the legislative power of the state is vested in the Legislature (art. IV, § 1) and the executive power in the Governor (art. VI, § 1). Unless permitted by the Constitution, the Governor may not exercise legislative powers. (Art. III, § 3.) He may veto a bill "by returning it with any objections to the house of origin," and it will become law only if "each house then passes the bill by rollcall vote . . . two thirds of the membership concurring. . . ." If the Governor fails to act within a certain period of time, the measure becomes law without his signature. (Art. IV, § 10, subd. (a).) The Governor's veto power is more extensive with regard to appropriations. He may "reduce or eliminate one or more items of appropriation while approving other portions of a bill." Such items may be passed over his veto in the same manner as vetoed bills. (Art. IV, § 10, subd. (b).)

Petitioners assert that, in vetoing legislation, the Governor acts in a legislative capacity, and that in order to preserve the system of checks and balances upon which our government is founded, he may exercise legislative power only in the manner expressly authorized by the Constitution. Since that document only authorizes the Governor to veto a "bill" or to reduce or eliminate "items of appropriation" the Governor may not veto part of a bill which is not an "item of appropriation." Section 45.5 is a substantive measure and cannot be so characterized, and it is only one provision of a bill rather than a "bill." Therefore, the Governor's attempted veto of that provision is invalid.

Respondents also rely on the separation of powers doctrine as the basis for their assertion that the Governor's veto of section 45.5 should be upheld. The purpose of the veto power is to circumscribe the power of the legislative branch, and, they assert, the Governor's veto authority must be liberally construed in order to preserve the separation of powers between the executive and legislative branches of government. To this end, the breadth of that power must relate to the nature of legislation which has

been presented to the Governor for approval. Here, claim respondents, the Legislature attempted to circumvent the Governor's power to disapprove legislation by separating in different bills the amount necessary to fund the program mandated by section 45.5 (the $9,776,000 allegedly included in the budget as part of the lump sum AFDC appropriation and the federal funds to implement the program) from the purpose of the appropriation, as set forth in section 45.5. By reducing the item in the budget for AFDC in the amount required to support the section 45.5 program and vetoing the section, the Governor was properly exercising the power granted to him in article IV, section 10, subdivision (b), to reduce items of appropriation.

For the reasons stated below, we shall conclude that petitioners' position must prevail on this issue.

The historical development of the veto power is chronicled in an article by Charles J. Zinn, the former Law Revision Counsel of the Committee of the Judiciary of the House of Representatives. (Zinn, The Veto Power of the President (1951) 12 F.R.D. 209; hereinafter *Zinn*.) According to *Zinn*, the veto originated in Rome, where the tribune of plebeians had the power to disapprove measures recommended by the senate, which represented the patrician class. The word "veto" means "I forbid" in Latin. Then, as now, the effect of the veto was negative, frustrating an act without substituting anything in its place.

In England, the power resided in the King, who could withhold approval of acts of Parliament absolutely with the message, "Le roi s'avisera," meaning "The King will think it over." This was a more discreet and elegant expression with the same effect. Because in England the veto was absolute and its exercise incompatible with the rise in the power of Parliament, it has not been exercised by the King since 1707 to disapprove domestic legislation. So powerful is this unofficial restraint that it has been said if the King were to receive a bill from Parliament calling for his own execution, he would have to approve it.

In the United States, the veto has evolved as an integral part of the system of checks and balances.[5] Woodrow Wilson viewed the power as the most formidable prerogative of the presidency. One historian has

---

[5] The provision of the United States Constitution granting the President power to veto laws states as follows: "Every bill which shall have passed the House of Representatives and the Senate, shall, before it become a law, be presented to the President of the United States; if he approves he shall sign it, but if not he shall return it, with his objections to that House in which it shall have originated, who shall enter the objections at large on their Journal, and proceed to reconsider it. If after such reconsideration two-thirds of that House shall agree to pass the bill, it shall be sent, together with the objections, to the other House, by which it shall likewise be reconsidered, and if approved by two-thirds of that House, it shall become a law." (Art. I, § 7, cl. 2.)

commented that, while the strength of Congress consists of its authority to enact legislation, the President's strength consists of his right to veto it.

This power is, however, circumscribed by an important limitation. The President may approve or reject a bill in its entirety, but he may not select portions of a bill for his disapproval. George Washington recognized this principle when he wrote in 1793 that " '[f]rom the nature of the Constitution I must approve all parts of a Bill, or reject it in toto.' " (*Zinn* at p. 230.)

The limitation is firmly rooted in our constitutional system. If the rule were otherwise, the sensitive balance between the powers granted the legislative and executive branches of government in the Constitution would be placed in jeopardy. Were the executive permitted to pick and choose among various provisions of a substantive measure, vetoing some but not all parts of a bill, he would be invading the authority of the legislative branch since the effect of such a power would be to permit him to affirmatively legislate. As a much-quoted early case commented, "the executive, in every republican form of government, has only a qualified and destructive legislative function, and never creative legislative power." (*State* v. *Holder* (1898) 76 Miss. 158 [23 So. 643, 645].)

While the rule prohibiting selective exercise of the veto is unyielding in the federal system, most states have provided an exception for items of appropriation. The omission of an item veto power in the federal Constitution has been criticized on the ground that its absence requires the President to veto an entire appropriation bill in order to disapprove expenditures in the bill which he views as unnecessary. The confederacy included in its Constitution a provision allowing the President to disapprove items of appropriation. Following the Civil War this provision was widely adopted by the states, and today a substantial majority of state constitutions contain such a provision. (*Thirteenth Guam Legislature* v. *Bordallo* (D.Guam 1977) 430 F.Supp. 405, 410.)

In California, the Constitution of 1849 included a gubernatorial veto provision similar to that contained in the United States Constitution. (Cal. Const. of 1849, art. IV, § 17; see fn. 5, *ante,* p. 1085.) The Constitution of 1879 added the item veto power, allowing the Governor to "object to one or more items" of appropriation in a bill which contained several "items of appropriation." (Cal. Const. of 1879, art. IV, § 16.) By constitutional initiative in 1922, the Governor was empowered not only to eliminate "items of appropriation" but to reduce them, while approving other portions of a bill. (Art. IV, § 10, subd. (b).) The 1922 amendment also directed the Governor to submit a budget to the Legislature containing his recommendation for state expenditures. (Art. IV, § 12, subd. (a).)

The fundamental principle that the executive may not veto parts of a general enactment has often been reiterated. In *Bengzon* v. *Secretary of Justice* (1937) 299 U.S. 410 [81 L.Ed. 312, 57 S.Ct. 252], the court had under consideration a measure enacted by the legislative body of the Philippines. Under the Organic Act, the Governor-General had the "usual and general veto power" and the power to veto items of appropriation. The bill in question provided for payment of gratuities to officers and employees of the government who had been retired because of governmental reorganization or reduction of personnel. One section included justices of the peace among the beneficiaries of the law, and another appropriated the necessary funds to carry out the program. It was held that the Governor-General could not veto the section extending the benefits of the bill to justices of the peace because the measure was not an appropriation bill but, rather, general legislation. The court observed that a general bill is not converted into an appropriation bill merely because it has one provision making an appropriation. If the ruling were otherwise, it was held, the Governor-General could veto any section of the bill, and the result would be the "enactment of a general law in an emasculated form not intended by the legislature. . . . This would not be negation of an item or items of appropriation by veto but, in effect, affirmative legislation by executive edict." (*Id.* at p. 414 [81 L.Ed.2d at p. 315].)

*State* v. *Holder, supra,* 23 So. 643, 645 relied on in *Bengzon,* put the case more dramatically. It held that if "a single bill, making one whole of its constituent parts, 'fitly joined together,' and all necessary in legislative contemplation, may be dissevered by the governor, and certain parts, torn from their connection, may be approved, and thereby become law, while the other parts . . . will not be law, we shall have a condition of things never contemplated, and appalling in its possible consequences." (See also *Thirteenth Guam Legislature* v. *Bordallo, supra,* 430 F.Supp. 405, 410.)

This court recognized that the Governor was prohibited from selectively vetoing general legislation in *Lukens* v. *Nye* (1909) 156 Cal. 498 [105 P. 593] . There, the Legislature enacted a measure appropriating money to pay a claim against the state. Before approving the bill, the Governor informed the assignees of the claim that the amount allowed was excessive, and that he would not approve the bill unless plaintiffs would agree to accept a lesser sum. Plaintiffs agreed, and sued for the full amount after the measure was approved.

We held for plaintiffs, stating that in exercising the veto power the Governor acts as a "legislative instrumentality," and as a special agent with limited powers, and that he may therefore act only as the Constitution allows. Except for a bill containing several items of appropriation, he may

not modify or change the effect of a proposed law "or . . . do anything concerning it except to approve or disapprove it as a whole." Thus, "[i]n the case of a bill containing several items of appropriation of money, he may approve one or more of them, and object to the others.[6] [Citation.] In no other case is he empowered to modify or change the effect of a proposed law, or to do anything concerning it except to approve or disapprove it as a whole." (156 Cal. 498 at pp. 501-503.) We cited *Lukens* with approval in *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 847-848 [157 Cal.Rptr. 676, 598 P.2d 836].)[7]

The same principle was expressed in a recent Colorado case on the basis of a constitutional provision similar to article III, section 3 of the California Constitution.[8] The Colorado Supreme Court held that the grant of the veto to the Governor was a grant of legislative power, and an exception to the separation of powers otherwise required by the Constitution. Therefore, the veto power could be exercised "only when clearly authorized by the constitution, and the language conferring it is to be strictly construed." (*Colorado General Assembly* v. *Lamm* (Colo. 1985) 704 P.2d 1371, 1385-1386.)[9]

Respondents assert that the statements from *Lukens, supra,* 156 Cal. 498, regarding the Governor's veto power are dicta since the Governor did not attempt to exercise his veto in that case but, rather, made a private agreement to reduce an appropriation. Even so, the principles set forth there are clearly correct. As we have seen, article III, section 3 provides that one branch of government may not exercise the powers granted to another

---

[6] *Lukens* was decided in 1909, before the Constitution was amended to allow the Governor to reduce an item of appropriation.

[7] In *California Mfrs. Assn.* the Governor signed a measure and advised the Senate that he had done so on the basis of an opinion of the legal staff of the Public Utilities Commission that it would have a certain effect. We held that the disclaimer had no effect insofar as it was inconsistent with the Legislature's purpose because the Governor did not have the power to qualify his approval by exercising an "item veto" as to a nonappropriation measure. (24 Cal.3d at . 848.)

[8] Article III of the Colorado Constitution provides: "The powers of the government of this state are divided into three distinct departments—the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted."

[9] We disagree with respondents' claim that the veto power should be liberally construed. They cite as authority *INS* v. *Chadha* (1983) 462 U.S. 919 [77 L.Ed.2d 317, 103 S.Ct. 2764]. The issue there was the validity of a statute which, in effect, allowed the House of Representatives, without the concurrence of the Senate, to veto a decision of the Attorney General relating to immigration. The high court held the statute unconstitutional because (1) the veto power in the bill was an exercise of legislative power, and both houses must exercise such power under the Constitution unless otherwise expressly excepted therein; and (2) the statute violated article I, section 7 of the United States Constitution, which provides that any bill passed by Congress must be presented to the President. Neither the holding of the case nor its language call for liberal construction of the President's veto power.

"except as permitted by this Constitution." Case law, commentators, and historians have long recognized that in exercising the veto the Governor acts in a legislative capacity. (See e.g., *La Abra Silver Mining Co.* v. *U.S.* (1899) 175 U.S. 423, 453 [44 L.Ed. 223, 233-234, 20 S.Ct. 168]; *State* v. *Holder, supra,* 23 So. 643, 645; *Colorado General Assembly* v. *Lamm, supra,* 704 P.2d 1371, 1382; 1 Bryce, The American Commonwealth (1913) p. 57; Wilson, Congressional Government (1973) p. 53; *Zinn,* 12 F.R.D. 207, 214-215.) It is not coincidental that from the first Constitution of this state in 1849, and in the United States Constitution as well, the executive's power to veto legislation has appeared in the legislative article.

█ It follows that in exercising the power of the veto the Governor may act only as permitted by the Constitution. That authority is to veto a "bill" (art. IV, § 10, subd. (a)) or to "reduce or eliminate one or more items of appropriation" (*id.,* subd. (b)).[10]

█ The Governor did not veto Bill 1379, but purported to disapprove only section 45.5 thereof, and we must decide, therefore, whether the veto was justified on the ground that section 45.5 is an "item of appropriation." The term has been defined in various ways. *Wood* v. *Riley, supra,* 192 Cal. 293, 303, defines it as "a specific setting aside of an amount, not exceeding a definite sum, for the payment of certain particular claims or demands . . . not otherwise expressly provided for in the appropriation bill." It "adds an additional amount to the funds already provided." In *Bengzon* the term was described as a bill whose "primary and specific aim . . . is to make appropriations of money from the public treasury." (299 U.S. 410 at p. 413 [81 L.Ed. 312 at p. 314].) Other cases employ somewhat different definitions (e.g., *Jessen Associates, Inc.* v. *Bullock* (Tex. 1975) 531 S.W.2d 593, 599 ["setting aside or dedicating of funds for a specified purpose"]; *Commonwealth* v. *Dodson* (1940) 176 Va. 281 [11 S.E.2d 120, 127] ["an indivisible sum of money dedicated to a stated purpose"]).

We do not see how it can be seriously claimed that section 45.5 qualifies as an item of appropriation under any of these definitions. It does not set aside money for the payment of any claim and makes no appropriation from the public treasury, nor does it add any additional amount to funds already provided for. Its effect is substantive. Like thousands of other statutes, it

[10] There is no merit in respondents' assertion that the aspect of *Lukens, supra,* 156 Cal. 498, we discuss above was limited by *Wood* v. *Riley* (1923) 192 Cal. 293 [219 P. 966], a case we discuss later in this opinion. *Wood* involved the scope of the Governor's powers under the 1922 amendment to our Constitution which allowed the Governor to reduce an item of appropriation. *Lukens* was distinguished in the opinion on the ground that it was decided before the 1922 amendment and "dealt with the effect of the agreement by which the Governor was induced to sign the bill . . . ." (*Id.* at p. 299.)

directs that a department of government act in a particular manner with regard to certain matters. Although as is common with countless other measures, the direction contained therein will require the expenditure of funds from the treasury, this does not transform a substantive measure to an item of appropriation. We agree with petitioners that section 45.5 only expresses the Legislature's intention that the AFDC appropriation, whatever its amount, must be used to provide benefits to recipients from the date of application under certain circumstances.

Respondents' arguments to the contrary are not convincing. They claim that section 45.5 is in reality part of an "item of appropriation." Such an item consists of two indivisible parts: the sum appropriated and its purpose. (Citing *Wood* v. *Riley, supra,* 192 Cal. 293.)[11] The "normal" form of appropriation, according to respondents, is to combine the substantive provisions which will require the expenditure of funds with the appropriation for that purpose in one bill, and the measure is then subject to the veto as to both purpose and funding. Here, the Legislature attempted to evade a veto by separating these indivisible parts, placing the appropriation in the budget bill, and its purpose in a separate measure.[12] The Governor's veto of section 45.5 was a proper response to the Legislature's attempt to violate the system of checks and balances.

We cannot agree, however, that the appropriation and its purpose were set forth in separate measures. Both were specified in the Budget Act, that is, over $1.5 billion was appropriated for the purpose of funding AFDC. The Governor is bound by this "purpose" as set forth in the budget. If the Legislature chooses to budget by a lump sum appropriation, he may eliminate or reduce the amount available for the purpose as set forth therein.

---

[11] *Wood* relied on a quotation from a prior case as follows: " ' "In ordinary bills the single subject is a unit which admits of approval or disapproval as a whole, without serious inconvenience, even though some of the details may not be acceptable. But every appropriation, though it be for a single purpose, necessarily presents two considerations almost equally material, namely, the subject and the amount. The subject may be approved on its merits, and yet the amount disapproved. . . . If the Legislature, by putting purpose, subject, and amount inseparably together, and calling them an 'item,' can coerce the Governor to approve the whole or none, then the old evil is revived, which this section was intended to destroy."

" 'It cannot be questioned that the preceding quotations state the evil which our Constitution makers wished to prevent. In plain English, they wished the Governor to have the right to object to the expenditure of money *for a specified purpose and amount,* without being under the necessity of at the same time refusing to agree to another expenditure which met his entire approval.' " (192 Cal. at p. 304, italics added.)

[12] In support of their position, respondents have included as appendices to their brief declarations by officials of the Department of Finance stating that the AFDC appropriation was increased by $9,776,000 to finance the change in the beginning date of aid mandated by section 45.5, and that some legislators had discussed in committee the desirability of rendering section 45.5 immune from veto by separating its provisions from the appropriation to fund its implementation.

Here, the Governor not only reduced the "item of appropriation" as set forth in the budget, but he divided it into its supposed component parts, assigned a purpose and amount to the part he disapproved, reduced the total by that amount, and attempted to veto a portion of a substantive bill which he claims contains the "subject of the appropriation." We are aware of no authority which even remotely supports the attempted exercise of the veto in this manner.

Respondents place primary reliance on *Wood* v. *Riley, supra,* 192 Cal. 293. That case was decided one year after the Constitution was amended in 1922 to allow the Governor to reduce as well as eliminate "items of appropriation." There, the Legislature added a proviso to the budget bill requiring the State Controller to transfer 1 percent of a lump sum appropriation to a government department for a certain purpose, at the request of the Director of Education. The Governor vetoed the proviso, and the Director of Education, claiming that the veto was ineffective, filed suit against the Controller to transfer the funds from the larger appropriation. The veto was upheld on the ground that the proviso was an "item of appropriation."[13]

Respondents point to several statements in the opinion to the effect that the Legislature had attempted to evade the Governor's veto power by the manner in which it set forth the appropriation. The opinion comments that had the Legislature made an express appropriation of the amount and for the purposes set forth in the proviso, the Governor would have vetoed it. If the provision were immune from the veto the Legislature might "by indirection, defeat the purpose of the constitutional amendment giving the Governor power to control the expenditures of the state, when it could not accomplish that purpose directly or by an express provision in appropriation bills. . . . The point of this decision is that the legislature attempted to make an appropriation . . . in such way as to circumvent the veto power of the Governor. Under the constitution of the state . . . he had the power to eliminate the item . . . ." (192 Cal. 293 at pp. 305-306.)

The present case is similar to *Wood,* according to respondents, because here, too, the Legislature has attempted to avoid the veto power of the

---

[13] The Director of Education claimed that the Governor was attempting to veto part of a sentence in a bill which did not appropriate money because the proviso only required a bookkeeping transfer of funds from an amount already appropriated. The Controller responded that the proviso amounted to an "item of appropriation," and was therefore subject to the Governor's veto.

This court agreed with the Controller's position, holding that the proviso was an appropriation because it directed the "specific setting aside of an amount, not exceeding a definite fixed sum, for the payment of certain particular claims or demands." This was an "item of appropriation" because it added an additional amount to the funds already provided for the administration of the office of the Director of Education. (192 Cal. at p. 303.)

Governor. In order to prevent the evasion the term "item of appropriation" as used in the Constitution should be interpreted to include a measure like section 45.5. As we point out above, however, no definition of that term—including the one employed in *Wood* itself—can reasonably embrace a provision like section 45.5, which does not set aside a sum of money to be paid from the public treasury. The fact that in *Wood* the term "item of appropriation" was construed in such a way as to facilitate the Governor's power to veto a portion of the budget bill which could reasonably be encompassed within the meaning of that term does not provide authority for holding, as respondents suggest, that the Governor may veto part of a general bill—a power denied him by the Constitution—in order to foil an alleged legislative attempt to evade the veto.[14]

Another theory advanced by respondents to support the validity of the veto of section 45.5 is that even if the section is not deemed to be an "item of appropriation," the Governor acted properly because the section, standing alone, is a "bill" for the purpose of determining the scope of the veto power. The argument is as follows: although section 45.5 is purportedly part of Bill 1379, the bill in fact includes provisions relating to many different subjects; a multisubject bill violates article IV, section 9 of the Constitution; when such a bill is presented to the Governor, he may exercise his veto on a subject-by-subject basis; since section 45.5 amounts to legislation on a separate subject, the section is a "bill" for the purpose of the Governor's veto; ergo, by vetoing the section, he vetoed a "bill," as he is authorized to do by the Constitution.[15]

Again, respondents' claim has no support in either the Constitution or case law. ▇▇ While one or more subjects may be referred to in a single

[14]*Reardon* v. *Riley* (1938) 10 Cal.2d 531 [76 P.2d 101], is also inapposite. There, the Legislature appropriated more than $1.625 million for the Department of Industrial Relations, specifying that certain portions of that amount would be used for a precise purpose. The Governor vetoed the portion of the bill which related to the specific purpose, as well as the amount appropriated therefor. It was held that the veto was valid and that the fact the specific portion of the overall appropriation was disapproved did not reduce the total of the lump sum appropriation for the department. Respondents claim that the holding in *Reardon* demonstrates that the Legislature may not define the term "item" by the manner in which it structures the budget bill, and that the court will look through the Legislature's attempt to bury an "item" in a larger measure. We disagree with this characterization of the holding. The parties conceded in *Reardon* that the specific purposes and the funds set aside for them were "items of appropriation," and the only issue was whether elimination of the specific item reduced the overall appropriation for the department.

 *Railroad Commission* v. *Riley* (1938) 12 Cal.2d 48 [82 P.2d 394] and *Pomeroy* v. *Riley* (1938) 12 Cal.2d 166 [82 P.2d 697] are to the same effect.

[15]Article IV, section 9, as we have seen, provides that a "statute shall embrace but one subject . . . ." Section 8, subdivision (b), of the same article states that the Legislature "may make no law except by statute and may enact no statute except by bill." Thus, according to respondents, when read together, the word "bill" can mean an enactment which relates to a single subject.

bill, the term "bill" is not synonymous with "subject." A bill is the "draft of a proposed law from the time of its introduction in a legislative house through all the various stages in both houses." (Black's Law Dict. (5th ed. 1979) p. 152.)

Not only would we be violating the plain words of the Constitution if we were to adopt the unwarranted definition proposed by respondents, but we would place an intolerable burden on the relations between the executive and legislative branches of government. If, as respondents suggest, the Governor has the power to exercise his veto as to any portion of a substantive bill which in his view constitutes a "subject," the result would be a continual conflict between the Governor and the Legislature over whether the scope of the veto power was exceeded because the Governor failed to confine his disapproval to a single subject encompassed in a bill. We find it ironic that respondents themselves concede that it is very difficult to define the term "subject" as used in the constitutional provision. We reject, therefore, respondents' claim that the Governor should be empowered to make a determination as to how many subjects are contained in a bill presented to him for signature, and to veto parts of a bill which he determines constitute a separate subject therein.

Before we reach the issue whether Bill 1379 violates the single subject provision of article IV, section 9 of our Constitution, we consider an interesting argument made by respondents as to the relationship between that provision and the veto power. In construing the provisions of the Constitution each must be "read in the context of the other provisions . . . bearing on the same subject. [Citation.] The goal . . . is to harmonize all related provisions if it is reasonably possible to do so without distorting their apparent meaning, and in doing so to give effect to the scheme as a whole." (*Fields* v. *Eu* (1976) 18 Cal.3d 322, 328 [134 Cal.Rptr. 367, 556 P.2d 729].)

In the present case, argue respondents, the one subject rule and the veto power are related to one another in that the Governor has the power to veto bills (art. IV, § 10), and a bill may not contain more than one subject (art. IV, § 9). This relationship is evident on a pragmatic level since the broader the meaning given to the term "one subject" in the Constitution, the narrower is the power of the Governor to veto legislation. The Governor must accept all of the provisions of a nonappropriation bill or disapprove the whole measure, and the greater the range of matters that can be included in a bill, the more difficult a veto decision becomes. Even if a liberal construction of the word "subject" might be appropriate for deciding whether a bill violates the single subject rule in the absence of a veto, where, as here, the Governor has vetoed a provision which he claims violates the rule, liberal construction would be unjustified because it would diminish the effect of the

Governor's veto power and violate the maxims of constitutional interpretation recited above.

This appears to be a matter of first impression in California, although a few cases from other jurisdictions have related the efficacy of the Governor's veto power to the scope of the single subject rule. (*Turner* v. *Wright* (1957) 11 Ill.2d 161 [142 N.E.2d 84, 90]; *Commonwealth* v. *Barnett* (1901) 199 Pa. 161 [48 A. 976, 977]; see *State* v. *Henry* (1935) 82 Wis.2d 679 [260 N.W. 486, 492, 99 A.L.R. 1267].)[16] As we shall see, the primary purpose of the one subject rule is the regulation of legislative procedures: the avoidance of logrolling by legislators in the enactment of laws. (Ruud, *One-Subject Rule* (1958) 42 Minn.L.Rev. 389, 391, hereinafter referred to as *Ruud*.) The veto power, on the other hand, provides the executive with a defense against the power of the Legislature. (*Thirteenth Guam Legislature* v. *Bordallo, supra,* 430 F.Supp. 405, 409.) There is no evidence that the framers of our Constitution recognized a relationship between the two provisions. The single subject rule was adopted without debate in the Constitutional Convention which led to the adoption of the Constitution of 1849. (Debates & Proceedings, Cal. Const. Convention 1849, p. 90.) During the 1879 Constitutional Convention the purpose of the provision was stated to be "to prevent collusion in a legislative body; to prevent the passage of what are called omnibus bills—uniting various interests in order to get them passed." (Debates & Proceedings, Cal. Const. Convention 1878-1879, p. 798.) There is some doubt, therefore, whether in a historical sense at least, the single subject rule and the veto power bear on the "same subject" and are "related provisions" which must be harmonized in order to give effect to a constitutional scheme as a whole. (*Fields* v. *Eu, supra,* 18 Cal.3d 322, 328.)

Nevertheless, it cannot be denied that as a practical matter the broader the definition ascribed to the term "one subject" in the Constitution, the more circumscribed is the Governor's power to veto legislation. The problem is intriguing and would warrant discussion and analysis in an appropriate case. In the present case, however, we shall conclude that Bill 1379 violates the single subject rule on the basis of the settled rules established in a nonveto context; we have no occasion, therefore to decide whether, as respondents urge, the single subject rule should be strictly construed when the Governor has vetoed a bill which he alleges violates the rule.

### Validity of Bill 1379

Petitioners argue that we should not consider the question of the validity of Bill 1379 because respondents did not timely raise in the Court of Appeal

---

[16] *Zinn* comments on the relationship between the President's veto power and the number of subjects contained in a bill. Although the United States Constitution contains no single subject provision, Congress has adopted a rule that matters not germane to a bill are subject to a point of order. (*Zinn,* 12 F.R.D. 204 at pp. 240-241.)

their claim that the bill violates the single subject provision of the Constitution (Cal. Rules of Court, rule 28(a)), and that respondents have no standing to raise the issue. We disagree on both counts.

■ The alleged violation of the single subject rule was raised by respondents in the Court of Appeal in their answer to the amicus curiae brief filed by the California Legislature, and again in response to the alternative writ of mandate issued by the Court of Appeal following our remand to that court.

■ As to the issue of standing, petitioners assert that the Governor may not claim that section 45.5 is invalid on single subject grounds because he does not have the power to veto legislation based on his opinion that it is unconstitutional.[17] The rules relating to "standing" refer to a plaintiff's ability to challenge the constitutionality of a statute if he is not injured by its operation. (5 Witkin, Summary of Cal. Law (8th ed. 1974) § 44, p. 3282.) The Governor is not a plaintiff in this proceeding but a respondent and his assertion that section 45.5 violates the single subject rule is employed as a matter of defense to petitioner's claim that the measure is valid and his veto ineffective. The issue raised by respondents is of great public importance, the matter has been fully briefed by the parties, and petitioners have cited no authority which requires us to postpone consideration of the matter until, as they suggest, a taxpayer challenges the constitutionality of Bill 1379 on the ground that it violates the single subject rule.

■ We come, then, to the merits of the question whether Bill 1379 violates article IV, section 9 of the Constitution. It provides, as we have seen, that a "statute shall embrace but one subject, which shall be expressed in its title." This provision has its origin in the Constitution of 1849. (Art. IV, § 25.)[18]

Petitioners' argument that Bill 1379 does not violate the single subject rule is based on a simple premise: they deny that the provision sets forth an independent requirement that a bill must be confined to one subject and assert that a statute complies with the Constitution even if it includes numerous unrelated subjects so long as they are all germane to the title of the act. The problem with this claim is that it reads the single subject

---

[17] Whether the executive may veto legislation on the ground that it is unconstitutional has been considered a number of times on the federal level. Opinion is sharply divided; some authorities and public figures take the position that such action interferes with the power of the courts, while others assert that the veto power may be used to disapprove unconstitutional legislation. (See *Zinn,* 12 F.R.D. 209, 230-231.)

[18] The second sentence of the section, providing for severability of subjects not contained in the title of the statute, was added in 1879. (Cal. Const. of 1879, art. IV, § 24.)

provision out of the Constitution and substitutes for it a provision that a statute with multiple subjects complies with section 9 so long as those subjects are included within the title.

■ Contrary to petitioners' assertion, the two aspects of section 9 relating to the subject of an act and its title are independent provisions which serve separate purposes. A statute must comply with both the requirement that it be confined to one subject and with the command that this one subject be expressed in its title. (See 1A Sutherland, Statutory Construction (1985 rev. ed.) § 17.01, p. 1; *Ruud* at p. 391.)

The single subject clause has as its "primary and universally recognized purpose" the prevention of log-rolling by the Legislature, i.e., combining several proposals in a single bill so that legislators, by combining their votes, obtain a majority for a measure which would not have been approved if divided into separate bills. (*Ruud* at p. 391.) As of 1982, the constitutions of 41 states included a single subject requirement. (1A Sutherland, *op. cit., supra,* at pp. 1-2.) The purpose of the requirement that the single subject of a bill shall be expressed in its title is to prevent misleading or inaccurate titles so that legislators and the public are afforded reasonable notice of the contents of a statute. (See e.g., *Ex parte Liddell* (1892) 93 Cal. 633, 635-656 [29 P. 251]; *Abeel* v. *Clark* (1890) 84 Cal. 226, 228 [24 P. 383].)

The authorities cited by petitioners for the proposition that compliance with the title requirement satisfies section 9 do not support their claim. They call for a liberal construction of section 9 so that it does not become a "loophole of escape from, or a means for the destruction of legitimate legislation" (*Heron* v. *Riley* (1930) 209 Cal. 507, 510 [289 P. 160]), but they do not suggest that an accurate title alone will comply with the single subject rule. For the most part, the cases they cite involve a challenge only to the appropriateness of the title of a statute (e.g., *Heron* v. *Riley, supra,* 209 Cal. 507, 512-514; *Ex parte Hallawell* (1909) 155 Cal. 112, 113-114 [99 P. 490]; *Estate of McPhee* (1908) 154 Cal. 385, 389 [97 P. 878]; *Ex parte Liddell, supra,* 93 Cal. 633, 635; *Abeel* v. *Clark, supra,* 86 Cal. 226, 228), although a few relate also to the single subject rule, and these evaluate the merits of both the single subject and title requirements (e.g., *Robinson* v. *Kerrigan* (1907) 151 Cal. 40, 50-51 [90 P. 129]).

A few cases have held statutes unconstitutional on the basis that they violated the single subject rule in addition to the title requirement. (E.g., *In re Werner* (1900) 129 Cal. 567, 572-575 [62 P. 97]; *People* v. *Parks* (1881) 58 Cal. 624, 638-640; see *Hill* v. *Board of Supervisors* (1917) 176 Cal. 84, 87 [167 P. 514] [overruled on other grounds in *Simpson* v. *Hite* (1950) 36

Cal.2d 125, 131 (222 P.2d 225)]; cf. *Planned Parenthood Affiliates* v. *Swoap* (1985) 173 Cal.App.3d 1187, 1196-1201 [219 Cal.Rptr. 664].)

■■■ Bill 1379 amends, repeals, or adds approximately 150 sections contained in more than 20 codes and legislative acts. Its title describes the measure as "relating to fiscal affairs, making an appropriation therefor, and declaring the urgency thereof to take effect immediately." (Stats. 1984, ch. 268, p. 1302.) Respondents characterize the measure as a "trailer bill" which "trails" the budget bill and is closely related to it. Both bills follow the same legislative path, and are reviewed by the same legislative committees on the same time schedule. Section 71 of the bill provides that it is an urgency measure to take effect immediately and that it provides "necessary statutory adjustments to implement the Budget Act of 1984." (*Id.* at p. 1408.)

Many cases which discuss the single subject rule combine its expression with the requirement that the single subject of the enactment must be stated in its title even though, as we note above, each aspect of the constitutional provision declares a separate requirement with an independent purpose. This combination is natural in view of the fact that both requirements appear in a single sentence and are related to one another.

Here, however, respondents' main concern is that the text of Bill 1379 contains more than one subject. *Evans* v. *Superior Court* (1932) 215 Cal. 58 [8 P.2d 467], although decided more than half a century ago, remains the leading authority on the construction of section 9 of article IV of the Constitution. In that case, the Legislature adopted the entire Probate Code in one enactment with a title declaring that it was an "act to revise and consolidate the law relating to probate . . . to repeal certain provisions of law therein revised and consolidated and therein specified; and to establish a Probate Code." This court held that the act contained only one subject, and that that subject was expressed in its title.

■■■ The opinion, like those before and after it, confirms the liberal construction to be accorded the single subject rule. It states the following principles as the basis of its holding: "Numerous provisions, having one general object, if fairly indicated in the title, may be united in one act. Provisions governing projects so related and interdependent as to constitute a single scheme may be properly included within a single act. [Citation.] The legislature may insert in a single act all legislation germane to the general subject as expressed in its title and within the field of legislation suggested thereby. [Citation.] Provisions which are logically germane to the title of the act and are included within its scope may be united. The general purpose of a statute being declared, the details provided for its

accomplishment will be regarded as necessary incidents. [Citations.] . . . A provision which conduces to the act, or which is auxiliary to and promotive of its main purpose, or has a necessary and natural connection with such purpose is germane within the rule." (215 Cal. at pp. 62-63.)[19]

In analyzing petitioners' contentions, it is helpful to consider decisions of this court which have applied the single subject rule in a context independent of the title requirement. In 1948, California adopted a single subject constitutional provision applicable to initiatives. It states that an initiative measure embracing more than one subject may not be submitted to the electors or have any effect (Cal. Const., art. II, § 8, subd. (d)), and it does not incorporate in the same sentence the requirement that the subject must be expressed in the title; nor does it contain a provision for severance in the event more than one subject is included in the measure.[20] Shortly after the adoption of this provision, it was held that the same principles apply to the single subject rule relating to initiatives as to legislative enactments. (*Perry v. Jordan* (1949) 34 Cal.2d 87, 92-93 [207 P.2d 47].) The single subject rule as applied to the initiative has the dual purpose of avoiding logrolling and voter confusion. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281].)

In three recent cases, we have relied on the rules laid down in *Evans, supra,* 215 Cal. 58, to uphold initiative measures challenged on the ground that they embraced more than one subject. (*Amador Valley Joint Union High School Dist.* v. *State Board of Equalization, supra,* 22 Cal.3d 208, 229-232; *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 37-43 [157 Cal.Rptr. 855, 599 P.2d 46]; hereinafter *FPPC; Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 245-253 [186 Cal.Rptr. 30, 651 P.2d 274].) In each of these decisions, we held that the measures involved complied with *Evans* in that their provisions were "reasonably germane" to the object of the act. As additional support for its conclusion, *Amador* held that the constitutional initiative involved there contained provisions which were " 'functionally related in furtherance of . . . a common underlying purpose.' " (22 Cal.3d at p. 230.)[21] The initiative changed the previous system of real property

---

[19]*Evans* does not hold that the single subject rule may be satisfied by a proper title. Although the opinion contains the statement that the main object of "the provision" is to assure that the title of an act does not mislead legislators, this portion of the opinion refers to the title requirement of section 9 rather than the single subject clause. (215 Cal. at p. 62.)

[20]A different provision of the Constitution directs the Attorney General to prepare a title for an initiative petition. (Art. II, § 10, subd. (d).)

[21]Shortly before *Amador* was decided, a single subject challenge was made to another initiative measure. In that case, the Attorney General refused to prepare a title and summary for a proposed initiative on the ground that it violated the single subject rule. We held that his duty in this regard was ministerial, and that he was not authorized by the Constitution to refuse preparation of the title and summary without prior judicial authorization. (*Schmitz* v.

taxation and imposed limitations on the assessment and taxing power of local and state government.

The following year, we were faced with another single subject challenge in *FPPC*. The measure in that case concerned "elections and different methods for preventing corruption and undue influence in political campaigns and governmental activities." (25 Cal.3d at p. 37.) Again, we upheld the initiative concluding that its provisions were "reasonably germane" to the subject of political practices.

In the last of these cases, *Brosnahan,* a majority of this court rejected the claim that the single subject rule requires that a measure meet both the "reasonably germane" and "functionally related" tests, and held that either standard would satisfy the constitutional requirement. The initiative measure in that case had as its aim the accomplishment of changes in the criminal justice system for the purpose of protecting the rights of victims of crime. The majority concluded that it did not violate the rule because "[e]ach of its several facets bears a common concern, 'general object' or 'general subject,' promoting the rights of actual or potential crime victims." (32 Cal.3d at p. 247.)

In a statement which is important to the resolution of the issue before us, the majority observed that proponents of initiative measures do not have "blank checks to draft measures containing unduly diverse or extensive provisions bearing no reasonable relationship to each other or to the general object which is sought to be promoted. The single subject rule indeed is a constitutional safeguard adopted to protect against multifaceted measures of undue scope. For example, the rule obviously forbids joining disparate provisions which appear germane only to topics of excessive generality such as 'government' or 'public welfare.'" However, we concluded that the initiative sustained fairly disclosed a "reasonable and common sense relationship among their various components in furtherance of a common purpose." (32 Cal.3d at p. 253.) The decision commanded a bare four-to-three majority (dis. opn. by Bird, C. J.; Mosk, J., filed a separate dis. opn. joined by Broussard, J.), but all seven justices agreed that subjects of "excessive generality" would violate the purpose and intent of the single subject rule.[22]

*Younger* (1978) 21 Cal.3d 90 [145 Cal.Rptr. 517, 577 P.2d 652].) A dissenting opinion by Justice Manuel suggested that the single subject rule should be applied more strictly to initiative measures than to legislative bills, and that the "functionally related" test was the appropriate standard by which to measure compliance of initiatives with the rule. (21 Cal.3d at pp. 98-100.)

[22] The dissenting opinion of Mosk, J., referred to the views expressed in a prior concurring and dissenting opinion. (32 Cal.3d at p. 299.) The prior opinion states: "The constitutional requirement is not satisfied by attaching a broad label to a measure and then claiming that its provisions are encompassed under that wide umbrella. Otherwise, initiatives which refer to

 In sum, these cases hold that a measure complies with the rule if its provisions are either functionally related to one another or are reasonably germane to one another or the objects of the enactment.

Bill 1379 complies with none of these standards. Petitioners do not claim that the provisions of the bill are either functionally related or germane to one another, and examination reveals that there is no apparent relationship among its various sections. A few examples will suffice: section 0.2 amends a provision of the Business and Professions Code to require that before transmitting a fiscal impact report to the Legislature, agencies within the Department of Consumer Affairs must submit it to the director of the department (Stats. 1984, ch. 268, p. 1306). Section 0.4 amends the same code to provide that the Contractors' State License Board may disclose to the public general information regarding complaints filed against licensees (*ibid.*); section 28.4 amends the Military and Veterans Code to provide that a veterans' home may be appointed guardian of the estate of a veteran (*id.* at p. 1352); section 66.7 permits concession contracts for state parks to exceed 20 years (*id.* at p. 1405).

Our second inquiry is whether the provisions of Bill 1379 can be fairly characterized as "reasonably germane" to the objects of the measure. Petitioners suggest that the subject of Bill 1379 is "fiscal affairs," as stated in its title, and that its object is "to make statutory adjustments which relate to the ongoing allocation of state funds appropriated annually in the budget bill, within the state programs so funded." Section 45.5 comes within this object because it "affects the cost of the state's AFDC program."

We understand this somewhat cryptic analysis to mean that the goal of Bill 1379 is to reflect matters encompassed in the budget bill, and that since the cost of the program mandated by section 45.5 affects the amounts appropriated in the budget, its provisions are conducive to that goal and therefore in compliance with the single subject rule.

Our unanimous determination in *Brosnahan, supra,* 32 Cal.3d 236, that a bill which encompasses matters of "excessive generality" violates the purpose and intent of the single subject rule is applicable to this assertion. "Fiscal affairs" as the subject of Bill 1379 and "statutory adjustments" to the budget as its object suffer from the same defect. They are too broad in scope if, as petitioners appear to claim, they encompass any substantive measure which has an effect on the budget. The number and scope of topics

'property' or 'women' or 'public welfare' or 'the pursuit of happiness' could also be held to constitute one subject, no matter how diverse their terms." (*Brosnahan v. Eu* (1982) 31 Cal.3d 1, 11 [181 Cal.Rptr. 100, 641 P.2d 200].) Chief Justice Bird, in her dissent, expressed similar views (32 Cal.3d at p. 273).

germane to "fiscal affairs" in this sense is virtually unlimited. If petitioners' position were accepted, a substantial portion of the many thousand statutes adopted during each legislative session could be included in a single measure even though their provisions had no relationship to one another or to any single object except that they would have some effect on the state's expenditures as reflected in the budget bill. This would effectively read the single subject rule out of the Constitution. We hold, therefore, that Bill 1379 is invalid as a violation of article IV, section 9 of the California Constitution.[23]

### Disposition

We next consider the difficult question of the effect of our ruling that the Governor's veto of section 45.5 was invalid and that Bill 1379 violates the single subject rule. It is clear from what we have said above that our holding in these respects does not constitute a new rule of law. We recognize, of course, that ordinarily a judicial decision which does not establish a new rule applies retroactively, and it is only if a ruling is new law that the issue of prospective operation arises. At most, our decision applies existing precedent to a distinct fact situation, a circumstance that does not readily overcome the presumption of retroactivity. (*People* v. *Guerra* (1984) 37 Cal.3d 385, 399 [208 Cal.Rptr. 162, 690 P.2d 635].) Nevertheless, we hold that our determination as to both rulings in this case is to be applied prospectively only.

With regard to our conclusion that Bill 1379 violates the single subject rule, it is appropriate to consider that the rule regulates internal procedures of the Legislature and its violation has little or no effect on individual rights

---

[23] Petitioners rely on dictum in a footnote in *Valdes* v. *Cory* (1983) 139 Cal.App.3d 773 [189 Cal.Rptr. 212], in which the court stated (fn. 3 at p. 780) that the provisions of a measure entitled "Fiscal Affairs" did not violate the single subject rule because they promoted the common purpose of balancing the budget. It is clear from what we have said above that we disagree with this statement.

Respondents in turn cite *Planned Parenthood Affiliates* v. *Swoap, supra,* 173 Cal.App.3d 1187, which held invalid as a violation of the single subject rule a rider added to the budget bill which amended a provision of the Welfare and Institutions Code relating to funds for family planning programs. In reaching its conclusion, the court relied on dicta in a recent opinion of this court (*Association for Retarded Citizens* v. *Department of Developmental Services* (1985) 38 Cal.3d 384 [211 Cal.Rptr. 758, 696 P.2d 150]) and several opinions of the Attorney General. The court reasoned that the Budget Act, like other statutes, must comply with the single subject rule, and that since the purpose of the budget bill is to itemize recommended expenditures, the addition of a rider containing a substantive provision of law was violative of the rule.

Petitioners attempt to distinguish the case on the ground that it relates to the Budget Act rather than to general legislation. We need not reach the issue whether this is a valid distinction since our conclusion that Bill 1379 violates the single subject rule is supported by the cases cited above, which were decided in a nonbudgetary context.

or vested property interests; that is, of course, the usual objection raised when the issue of potential retroactive application of a court decision arises.

In addition, retroactive application of our ruling in this instance would have serious consequences far beyond the question of the validity of section 45.5. It would mean not only that the many provisions contained in Bill 1379 in addition to section 45.5 are invalid, but the door would be opened to a challenge to numerous other provisions of substantive law contained in prior so-called budget implementation acts. According to the Legislative Counsel's office, the practice of enacting budget implementation bills began in the 1978-1979 fiscal year. Between that time and the enactment of Bill 1379 in 1984, several such bills were passed to make "adjustments" to the budget. A cursory examination of some of these measures reveals that they suffer from the same defect as Bill 1379, i.e., they combine in a single bill numerous provisions which have no relationship to one another, nor are they reasonably germane to the object of the bill, except in the broad sense that we hold improper.[24] Thus, an undetermined but substantial number of provisions in prior budget implementation bills would be subject to challenge. Finally, respondents themselves urge that our holding as to the single subject rule be made prospective in order to avoid the "devastating" effects of retroactivity. (Cf. *Sumner* v. *Workers' Comp. Appeals Bd.* (1983) 33 Cal.3d 965, 972 [191 Cal.Rptr. 811, 663 P.2d 534].)

In view of this conclusion, we hold also that our determination as to the Governor's veto power should not apply to section 45.5. The Governor would clearly have had the power to veto section 45.5 if it had been passed by the Legislature as a separate bill. His inability to do so was frustrated by the Legislature's unlawful inclusion of the section in a multisubject bill. In these circumstances, an evenhanded respect for the executive and legislative branches of government leads us to invoke an exception to the general rule of retroactivity (see *Forster Shipbuilding Co.* v. *County of Los Angeles* (1960) 54 Cal.2d 450, 458-459 [6 Cal.Rptr. 24, 353 P.2d 736]) so as to achieve a result that most closely conforms to the outcome that would have occurred if both the Legislature and the Governor had complied with the law. Accordingly, the Governor's veto of section 45.5 will not be invalidated and only that section of Bill 1379 will be rendered inoperative.

---

[24] A few examples will suffice: The budget implementation bill enacted in 1982 contained provisions to set the license fee for various medical laboratory licenses (Stats. 1982, ch. 327, § 2, pp. 1426-1427); specify the daily monetary allowance for public members of boards of the State Bar (*id.* § 4, p. 1427); establish school attendance review boards (*id.* § 9, pp. 1428-1429) and the holidays for state employees (*id.* § 54, pp. 1446-1447); and regulate the registration of firearms (§ 129, pp. 1472-1473). The 1983 bill included statutes to regulate the publication of notices for unclaimed property (Stats. 1983, ch. 323, § 1, p. 931); allow a school board to appoint officers of the California Cadet Corps (*id.* § 61.8, pp. 992-993); and require the Department of Justice to maintain state summary criminal history information and distribute the information to certain agencies (*id.* § 63.3, pp. 993-997).

 Petitioners also seek attorney fees under the "private attorney general" doctrine embodied in section 1021.5 of the Code of Civil Procedure.[25] We believe they are entitled to such an award, even though their named clients have not personally benefitted. They are the "successful" party in that the impact of our decision is to vindicate the principle upon which they brought this action, i.e., that the Governor's power to veto legislation cannot be exercised to invalidate part of a bill which is not part of an appropriation bill. (*Folsom* v. *Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 684-685 [186 Cal.Rptr. 589, 652 P.2d 437].) Our decision will result in enforcement of an important right affecting the public interest, conferring a "significant benefit" on the general public in clarifying the extent of the Governor's veto power and emphasizing the inviolability by the Legislature of the one-subject rule. It is obvious that private enforcement to give effect to section 45.5 was necessary since the director of the department refused to promulgate regulations to implement the section. Because this proceeding originated in the Court of Appeal, we cannot remand the matter to the trial court to determine the appropriate amount of attorney fees. We shall, therefore, direct the Court of Appeal to determine and award such fees.

The judgment of the Court of Appeal is affirmed insofar as it denies the petition for a peremptory writ of mandate. The cause is transferred to the Court of Appeal with instructions to award reasonable attorney fees to petitioners.

Lucas, C. J., Broussard, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

The petitions of all the parties for a rehearing were denied November 25, 1987, and the opinion was modified to read as printed above on October 29, 1987.

---

[25] Section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."