[No. B228680. Second Dist., Div. Three. Feb. 25, 2011.]

CALIFORNIA SCHOOL BOARDS ASSOCIATION et al., Petitioners, v. EDMUND G. BROWN, JR., as Governor, etc., et al., Respondents.

COUNSEL

Olson, Hagel & Fishburn, Deborah B. Caplan, N. Eugene Hill and Matthew R. Cody for Petitioners.

Atkinson, Andelson, Loya, Ruud & Romo, Karen E. Samman and Diane B. Rolen for Clovis Unified School District as Amicus Curiae on behalf of Petitioners.

Abraham K. Apraku for Mental Health Advocacy Services as Amicus Curiae on behalf of Petitioners.

Jeffrey A. DeLand for California State Legislature as Amicus Curiae on behalf of Petitioners.

Brian D. Lerner as Amicus Curiae on behalf of Petitioners.

Remcho, Johansen & Purcell, Karen A. Getman and Margaret R. Prinzing for California Teachers Association as Amicus Curiae on behalf of Petitioners.

Ronald D. Wenkart for Schools Legal Service as Amicus Curiae on behalf of Petitioners.

Association of California School Administrators; California Association of School Business Officials; California Congress of Parents Teachers & Students; California County Superintendents Educational Services; East County Special Education Local Plan Area; Grossmont Union High School; North Coastal Consortium for Special Education; North Inland Special Education Region; Poway Unified School District; Ramona Unified School District; San Diego South County Special Education Local Plan Area; and Torrance Unified School District as Amici Curiae on behalf of Petitioners.

Kamala D. Harris, Attorney General, Douglas J. Woods, Acting Assistant Attorney General, Constance L. LeLouis and Tamar Pachter, Deputy Attorneys General, for Respondents the State of California, Governor Edmund G. Brown, Jr., Secretary of the California Health and Human Services Agency, Diana S. Dooley and Acting Director of the Department of Mental Health, Cliff Allenby.

Amy Bisson Holloway and Peter J. Stubbs for Respondent Tom Torlakson.*

## OPINION

**CROSKEY, J.**—Under California Constitution, article XIII B, section 6, subdivision (a), whenever the state mandates a new program or higher level of service upon a local government, the state is required to provide a subvention of funds to reimburse the local government for the costs of the mandated program or increased service. In this case, we are concerned with a mandated program for which the state is several hundred million dollars in arrears in its payments to local governments. In November 2004, the voters approved Proposition 1A, which added to section 6 of article XIII B a provision requiring that the state begin reimbursing local governments for the amounts due. (Cal. Const., art. XIII B, § 6, subd. (b).) Under that provision, in each year, for each unreimbursed mandate, the Legislature is required to either (1) appropriate, in the annual budget act (Budget Act), the full amount due that year toward repaying the local governments for the unreimbursed mandate; or (2) suspend the operation of the mandate. (Cal. Const., art. XIII B, § 6, subd. (b)(1).) In the instant case, we are concerned with a mandate for which the Legislature appropriated the required amount in the budget bill (Budget Bill), and the Governor exercised his power of line-item veto to eliminate the appropriation (Cal. Const., art. IV, § 10, subd. (e)).

---

*As reflected in the opinion, Tom Torlakson, the California Superintendent of Public Instruction, has expressed support in these proceedings for the position of the petitioners.

■ In this original proceeding, we are asked to determine if the Governor had the power to veto the appropriation of reimbursement funding for the mandate, or if, to the contrary, the discretion to make an appropriation of mandate reimbursement funding is exclusively vested in the Legislature. We conclude that the Governor was constitutionally permitted to exercise his veto in this manner. We therefore will deny the petition to declare the Governor's veto void.

## FACTUAL AND PROCEDURAL BACKGROUND

The factual background leading to the instant proceeding is undisputed. A brief overview of the law governing mandate reimbursement and the history of the particular mandate at issue will help to place the instant dispute in proper context.

### 1. Mandate Reimbursement

Article XIII A was added to the California Constitution by Proposition 13 in 1978. It limited state and local governments' ability to increase taxes. The following year, the electorate approved Proposition 4, which added to the Constitution article XIII B, a complementary limit on the rate of growth of government spending. Included among its provisions was section 6, which provided for reimbursement to local governments for the costs of complying with certain requirements mandated by the state. (*County of Los Angeles v. Commission on State Mandates* (2007) 150 Cal.App.4th 898, 905 [58 Cal.Rptr.3d 762].) The purpose of this section " 'is to preclude the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are "ill equipped" to assume increased financial responsibilities because of the taxing and spending limitations that articles XIII A and XIII B impose. [Citations.]' [Citation.]" (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 588 [79 Cal.Rptr.3d 489].)

Following the adoption of article XIII B of the California Constitution, the Legislature enacted a comprehensive statutory and administrative scheme for enforcing it.[1] (See Gov. Code, § 17500 et seq.) Of particular relevance to the instant dispute is Government Code section 17581, which provides that if the

---

[1] The scheme includes, among other things, a process by which the Commission on State Mandates determines whether a particular statute imposes a reimbursable mandate on local agencies (Gov. Code, § 17551), and a process by which a local agency may file an action in the Superior Court of the County of Sacramento to declare an unfunded mandate unenforceable (Gov. Code, § 17612, subd. (c)).

Legislature identifies a particular mandate in the Budget Act as one for which reimbursement is not provided for that fiscal year, the local agencies are not required to comply with the mandate during that year.

For a number of years, the Legislature chose not to fund certain mandates, but did not identify the mandates in the Budget Act as those for which no reimbursement would be provided. Instead, the Legislature funded the mandates in the token amount of $1,000. This had the effect of *not* automatically suspending the operation of the mandates, but leaving them virtually unfunded.[2] Local agencies advanced considerable funds complying with drastically underfunded mandates, with the expectation of ultimately obtaining reimbursement from the state.

This state of events led to Proposition 1A, which was approved by the voters in November 2004. Proposition 1A, which was placed on the ballot by the Legislature, with the support of local governments,[3] added, among other things, section 6, subdivision (b) to California Constitution, article XIII B. That subdivision provides that, for every fiscal year, "for a mandate for which the costs of a local government claimant have been determined in a preceding fiscal year to be payable by the State pursuant to law, the Legislature shall either appropriate, in the annual Budget Act, the full payable amount that has not been previously paid, or suspend the operation of the mandate for the fiscal year for which the annual Budget Act is applicable in a manner prescribed by law." (Cal. Const., art. XIII B, § 6, subd. (b)(1).) The full arrearage may be paid over a term of years. (Cal. Const., art. XIII B, § 6, subd. (b)(2).) By statute, that period has been established to be 15 years. (Gov. Code, § 17617.) Thus, with respect to a reimbursable mandate, for each fiscal

---

[2] Some local agencies obtained judicial declarations that such minimally funded mandates were, in effect, unfunded and therefore suspended. (*Grossmont Union High School Dist. v. State Dept. of Education* (2008) 169 Cal.App.4th 869, 875 [86 Cal.Rptr.3d 890].) The judicial declaration was necessary; relief from compliance with a mandate is only automatic when the mandate is specifically identified in the Budget Act as being unfunded. (*Tri-County Special Educ. Local Plan Area v. County of Tuolumne* (2004) 123 Cal.App.4th 563, 573 [19 Cal.Rptr.3d 884].) Recent authority has held that the Legislature's practice of minimally funding mandates violates the California Constitution. (*California School Bds. Assn. v. State of California* (2011) 192 Cal.App.4th 770, 787 [121 Cal.Rptr.3d 696].) However, it confirmed that the proper remedy is to seek a judicial declaration that the mandate is, in effect, unfunded and therefore suspended. (*Id.* at p. 795.)

[3] According to the Voter Information Guide, local governments initially placed Proposition 65 on the ballot to address the issue of state legislators taking local government funds. However, once Proposition 1A was on the ballot, local governments dropped their support of Proposition 65, concluding that Proposition 1A was a "better measure" to address the problem. (Voter Information Guide, Gen. Elec. (Nov. 2, 2004) argument against Prop. 65, p. 15.)

year, the Legislature is required to choose to either fully fund the annual payment toward the arrearage or suspend the operation of the mandate.

### 2. Special Education Related Services

We are here concerned with a reimbursable mandate relating to special education. The federal Individuals with Disabilities Education Act (IDEA) (20 U.S.C. § 1400 et seq.) has the purpose of ensuring "that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . ." (20 U.S.C. § 1400(d)(1)(A).) "Related services" include social work services, counseling services, rehabilitation counseling, and medical services as may be required to assist a child with a disability to benefit from special education. (20 U.S.C. § 1401(26).) Under the IDEA, the federal government provides financial assistance[4] to states which submit plans that provide assurances that certain conditions will be met. (20 U.S.C. § 1412(a).) Among those conditions are that a free appropriate public education is available to all children with disabilities. (20 U.S.C. § 1412(a)(1)(A).) A state's educational agency must be responsible for meeting the IDEA's requirements. (20 U.S.C. § 1412(a)(11)(A).) However, the state may assign responsibility for the provision of related services to other agencies. (20 U.S.C. § 1412(a)(12).)

In California, the state and local education agencies[5] were initially responsible for providing not only special education, but all related services, to students with disabilities.[6] This was changed with the enactment of chapter 26 of division 7 of title 1 (now ch. 26.5) of the Government Code, now entitled "Interagency Responsibilities for Providing Services to Children with Disabilities."[7] (Gov. Code, § 7570 et seq.) Under this statute, local education agencies remained responsible only for education services. (Gov. Code, § 7573.) Related mental health services were to be provided by the State Department of Mental Health or community mental health agencies. (Gov. Code, § 7576.) We refer to these related mental health services as "Chapter 26.5 services."

---

[4] There is no dispute that the federal funds provided are not sufficient to cover the entirety of the costs of complying with the IDEA.

[5] We use the term "local education agencies" in its broadest sense, to include special education local plan areas and county offices of education, where appropriate.

[6] It is generally assumed that this obligation was *not* a reimbursable mandate, as there is no reimbursement for costs imposed by the state in order to obtain substantial federal funds. (Gov. Code, §§ 17513, 17556, subd. (c).)

[7] The parties also refer to this statute as Assembly Bill No. 3632 (1983–1984 Reg. Sess.).

As local mental health agencies had not previously been required to provide Chapter 26.5 services to special education students, local mental health agencies argued that these requirements constituted a reimbursable state mandate. In a series of three successive opinions, the Commission on State Mandates concluded that these requirements constituted a reimbursable state mandate, and discussed, in detail, exactly which expenses were reimbursable. (Nos. CSM-4282, 97-TC-05, 02-TC-40/02-TC-49.) Thus, there is no dispute in this case that the Chapter 26.5 services obligations at issue do, in fact, impose a reimbursable state mandate on local mental health agencies. We refer to this as the "Chapter 26.5 mandate."

3. *The 2010–2011 State Budget Act*

In making budget decisions, the state could decide to fully fund its repayment obligation under the Chapter 26.5 mandate, or decide not to do so. The state could also choose a middle course of funding the reimbursement for a limited time while simultaneously enacting legislation conveying responsibility for Chapter 26.5 services back to the local education agencies.[8] The decision among these options is a policy decision left to the Legislature and Governor; the wisdom of the course pursued by those branches of government is not a matter for judicial review. We note, however, that as early as the 2005–2006 budget—when the Proposition 1A arrearage payment requirements first went into effect—the Governor proposed returning responsibility for Chapter 26.5 services back to local education agencies. (Legis. Analyst, Rep. to Joint Legis. Budget Com., The 2006–07 Budget: Perspectives and Issues, pp. 218–219.)

By statute, the State Controller (the Controller) is required to submit an annual report, summarizing by mandate, the total amount of unpaid claims, by fiscal year. The report shall be made in an electronic spreadsheet and "shall be used for the purpose of determining the state's payment obligation under paragraph (1) of subdivision (b) of Section 6 of Article XIIIB of the California Constitution." (Gov. Code, § 17562, subd. (b)(2).) As a result of the April 2010 report, it was determined that the state owed local mental health agencies $132,941,000 as its 2010–2011 payment on its unfunded Chapter 26.5 mandate obligation. The Governor proposed suspending the Chapter 26.5 mandate obligation, shifting responsibility for providing Chapter 26.5 services back to local education agencies, and, therefore, deferring

---

[8] Even if requiring local education agencies to provide Chapter 26.5 services were held to constitute a mandate (see fn. 6, *ante*), California Constitution, article XIII B, section 6, subdivision (b) applies only to mandates affecting cities, counties, cities and counties, or special districts. (Cal. Const., art. XIII B, § 6, subd. (b)(4).) Thus, with respect to mandates on local education agencies, the Legislature is not forced to choose between funding the annual arrearage payment or suspending the mandate.

payment of the $132,941,000 due. The Legislature disagreed. (Legis. Analyst, Rep. to Conference Com. on the Budget, Overview of the May Revision, Assembly, and Senate Budget Plans, June 4, 2010, p. 8.)

The Budget Bill ultimately passed by the Legislature includes item 8885-295-0001, which appropriates a total of $216,336,000 for "payment of the following mandate claims for costs incurred in the 2004–05 through 2008–09 fiscal years." (Sen. Bill No. 870 (2009–2010 Reg. Sess.) § 2.00, item 8885-295-0001, schedule (1).) The item then lists 22 mandates to which the appropriation pertains; the 21st such mandate is the Chapter 26.5 mandate.[9] (Sen. Bill No. 870 (2009–2010 Reg. Sess.) § 2.00, item 8885-295-0001, schedule (1).) While there is no specific amount appropriated for each individual mandate, there is no dispute that the Chapter 26.5 mandate accounted for $132,941,000 of the $216,336,000 total.

The Governor exercised his line-item veto with respect to several aspects of the Budget Bill, and otherwise approved it on October 8, 2010. Specifically, the Governor reduced the 8885-295-0001 mandate reimbursement appropriation from $216,336,000 to $80,400,000. The Governor's veto message stated, "My policy is to suspend mandates not related to elections, law enforcement, or property taxes in order to maintain a prudent General Fund reserve. [¶] I am reducing this item by $132,941,000 by deleting Schedule (1)(oo) [(Ch. 26.5 mandate)]. This mandate is suspended."[10] (Governor's Objections to Budget Act of 2010, Stats. 2010, ch. 712.) The Legislature did not override the Governor's veto.[11]

### 4. *Aftermath of the Governor's Veto*

Local mental health agencies immediately began giving local education agencies notice that they would no longer provide Chapter 26.5 services, although many of them indicated that they would continue to provide the

---

[9] The budget item goes on to specify 53 additional mandates which are "specifically identified by the Legislature for suspension during the 2010–11 fiscal year" and appropriates a total of "0" for those mandates. (Sen. Bill No. 870 (2009–2010 Reg. Sess.) § 2.00, item 8885-295-0001, schedule (3).)

[10] The Governor further reduced the total appropriation by $2,995,000 by deleting the reimbursement funding pertaining to another mandate.

[11] Within 30 days of the enactment of the Budget Act, the Department of Finance is required to notify local agencies of any mandate which is suspended because reimbursement is not provided for that fiscal year. (Gov. Code, § 17581, subd. (b).) On November 8, 2010, the Department of Finance issued such a letter. It included the Chapter 26.5 mandate among the suspended mandates.

services if the local education agencies paid for them. On October 18, 2010, the Director of the Special Education Division of the State Department of Education informed local educational agencies that they were ultimately responsible to provide Chapter 26.5 services.

Two lawsuits followed. On October 21, 2010, a federal class action was brought by students who relied on Chapter 26.5 services against the Governor, the State Department of Education, the State Department of Mental Health, and several local education and mental health agencies. (*A.C. v. Schwarzenegger* (C.D.Cal.) No. CV10-7956.) The complaint in this action alleged that Chapter 26.5 services were being disrupted, in possible violation of the IDEA and other federal statutes. On November 5, 2010, numerous counties brought a declaratory relief action in Sacramento Superior Court, seeking an order relieving county mental health agencies from complying with the Chapter 26.5 mandate. (*County of Sacramento v. State of California* (Super. Ct. Sac. County, No. 34-2010-00090983).) Both of these actions are now pending.

California received $76 million in federal IDEA funds. On October 29, 2010, the State Department of Education indicated that it would distribute these funds to county mental health agencies in order to pay for continued provision of Chapter 26.5 services. This provided a short-term solution only; the funds were expected to be fully expended by mid-January, 2011.[12]

### 5. *The Instant Action*

The instant original proceeding in mandate was brought by California School Boards Association and its Education Legal Alliance, Los Angeles Unified School District, and Manhattan Beach Unified School District.[13] The respondents are the Governor, the State of California, the Superintendent of Public Instruction, the Secretary of the Health and Human Services Agency, the Director of the State Department of Mental Health, and the Controller.[14]

---

[12] In the Budget Bill, the Legislature indicated that the $76 million in IDEA funding should be used exclusively to support county mental health agencies providing Chapter 26.5 services. (Sen. Bill No. 870 (2009–2010 Reg. Sess.) § 2.00, item 6110-161-0890, provision 9.) In the Governor's veto message, the Governor purported to delete this provision to conform to his veto of the reimbursement funding for the Chapter 26.5 mandate. (Governor's Objections to Budget Act of 2010, Stats. 2010, ch. 712.) In addition to their main challenge in this proceeding, petitioners also question the Governor's use of the veto in this instance; however, as the funds have ultimately been allocated in accordance with the Legislature's intent as expressed in the provision vetoed by the Governor, the issue is moot.

[13] Numerous amicus curiae briefs and letters have been filed in support of petitioners.

[14] As new state officials took office on January 3, 2011, and all officers were sued in their official capacities only, the parties stipulated to a substitution of parties. Thus, the individually named respondents are now Governor Edmund G. Brown, Jr., Superintendent of Public

The petitioners in this case assert that, if the Governor's veto of reimbursement funding for the Chapter 26.5 mandate is upheld and the mandate is suspended, the local education agencies will be required to provide Chapter 26.5 services which they are ill equipped, and lack funding, to provide. The Superintendent of Public Instruction supports petitioners; the Controller has taken no position. References to "respondents" refer to the remaining respondents, who oppose the petition. Because of the importance and urgency of the issues presented, we have exercised our original jurisdiction and issued an order to show cause.[15]

## ISSUES PRESENTED

The issue presented in this proceeding is whether the Governor possessed the constitutional authority to exercise his line-item veto to delete the mandate reimbursement appropriation for the Chapter 26.5 mandate. Petitioners advance three arguments as to why the Governor was prohibited from exercising his veto in this manner:[16] (1) the Governor may only reduce a particular appropriation, not a provision directing how an appropriation is to be spent, and the Chapter 26.5 mandate reimbursement was not an individual appropriation, but simply a directive as to how the Controller was to spend the lump-sum mandate reimbursement appropriation; (2) California Constitution, article XIII B, section 6, subdivision (b)(1) provides that, for each mandate, "the Legislature" shall either appropriate the amount payable or suspend the mandate; once the Legislature has made the appropriation decision, it cannot be vetoed by the Governor by exercise of the line-item veto; and (3) the decision to eliminate the amount of an appropriation cannot

---

Instruction Tom Torlakson, Secretary of the Health and Human Services Agency Diana S. Dooley, and Acting Director of the State Department of Mental Health Cliff Allenby. Controller John Chiang remains a named respondent.

[15] At one point, we erroneously indicated that the Commission on State Mandates was the respondent in this matter, and that the respondents were, in fact, real parties in interest. This is an original proceeding; the Commission on State Mandates is not a party, and the respondents are properly designated as such. (See *St. John's Well Child & Family Center v. Schwarzenegger* (2010) 50 Cal.4th 960 [116 Cal.Rptr.3d 195, 239 P.3d 651].)

[16] Petitioners and amici curiae also raise arguments suggesting that the exercise of the Governor's veto, if upheld, will have devastating effects on the children dependent upon Chapter 26.5 services and the local education agencies who lack the funding and ability to provide those services. In this regard, our Supreme Court's comments in *St. John's Well Child & Family Center v. Schwarzenegger, supra*, 50 Cal.4th at pages 964–965 are equally applicable here: "Although the current economic downturn affects all Californians, many persons are particularly vulnerable because they receive essential health and welfare assistance from agencies dependent upon state tax revenues. In this setting, government must choose between and among equally needy groups, knowing that many of those groups not fully funded may be devastated." This difficult decision, however, is left to the Legislature and the Governor, not the courts.

be separated from the decision to suspend the operation of the mandate, and the latter is a matter of substantive policy left solely to the Legislature.

As we now explain, we reject each argument and conclude that the Governor's veto was properly exercised, and had the legal effect of suspending operation of the mandate.

## DISCUSSION

### 1. *The Governor's General Power to Veto Appropriations*

When the Governor exercises the power of veto, he is acting in a legislative capacity. (*Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1089 [240 Cal.Rptr. 569, 742 P.2d 1290].) As such, he may only act as permitted by the Constitution. (*Harbor*, at p. 1089.) This legislative act, however, is a necessary part of our system of separation of powers. "[L]egislative power . . . is circumscribed by the requirement that legislative acts be bicamerally enacted and presented to the head of the executive branch for approval or veto." (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 298 [105 Cal.Rptr.2d 636, 20 P.3d 533].)

California Constitution, article IV, section 8, subdivision (b) provides that the "Legislature may make no law except by statute and may enact no statute except by bill." Article IV, section 10, subdivision (a) provides, "Each bill passed by the Legislature shall be presented to the Governor. It becomes a statute if it is signed by the Governor. The Governor may veto it by returning it with any objections to the house of origin, which shall enter the objections in the journal and proceed to reconsider it. If each house then passes the bill by rollcall vote entered in the journal, two thirds of the membership concurring, it becomes a statute." Subdivision (e) of that section provides, "The Governor may reduce or eliminate one or more items of appropriation while approving other portions of a bill. The Governor shall append to the bill a statement of the items reduced or eliminated with the reasons for the action. The Governor shall transmit to the house originating the bill a copy of the statement and reasons. Items reduced or eliminated shall be separately reconsidered and may be passed over the Governor's veto in the same manner as bills." (Cal. Const., art. IV, § 10, subd. (e).) Thus, it cannot be disputed that the Governor possesses the constitutional authority to reduce or eliminate an item of appropriation in the Budget Bill passed by the Legislature.

## 2. The Chapter 26.5 Appropriation Was an Appropriation Against Which the Veto Could Be Exercised

■ If a general appropriation *specifically* includes smaller appropriations, the Governor may veto one or more of the smaller appropriations. (*Reardon v. Riley* (1938) 10 Cal.2d 531, 534–535 [76 P.2d 101].) In such a situation, the Governor may, but is not required to, reduce the larger appropriation in an equivalent amount. (*Id.* at pp. 535–536; *Pomeroy v. Riley* (1938) 12 Cal.2d 166, 167–168 [82 P.2d 697].)

The rule is different when there is a lump-sum appropriation which is intended for multiple purposes, but does not specifically allocate amounts to each of those purposes. In that situation, the Governor may reduce the lump-sum appropriation. (*Harbor v. Deukmejian, supra,* 43 Cal.3d at pp. 1090–1091.) However, the Governor may *not* attribute the amount of the reduction to a specific purpose, and thereby transform his reduction of the lump sum into a veto of the *use* of the remaining appropriation for the disfavored purpose. (See *ibid.* [reduction of lump-sum appropriation permitted; veto of portion of subsequent substantive bill containing subject of appropriation prohibited]; 14 Ops.Cal.Atty.Gen. 181 (1949) [reduction of lump-sum appropriation permitted; attempt to eliminate one specific subject of appropriation via veto message prohibited].)

In this case, petitioners argue that the Budget Bill passed by the Legislature did not include a *specific* $132,941,000 appropriation (which would be subject to a line-item veto) for the reimbursement payments due with respect to the Chapter 26.5 mandate. Instead, the Budget Bill included only a general appropriation of $216,336,000 for reimbursement payments for 22 different mandates, of which the Chapter 26.5 mandate was one.[17] Thus, they argue that while the Governor may have possessed authority to reduce or eliminate the $216,336,000 appropriation, he did not have the authority to strike one specific purpose (the Ch. 26.5 mandate reimbursement) from the list of general purposes for which the total amount was appropriated. In this regard, they note that the Budget Act provided, "Whenever herein an appropriation is made in accordance with a schedule set forth after the appropriation, the expenditures from that item for each category, program, or project included in the schedule shall be limited to the amount specified for that category, program, or project, except as otherwise provided in this act. Each schedule is a restriction or limitation upon the expenditure of the respective appropriation

---

[17] It was well known which amounts were attributable to each mandate; it is not clear why the Legislature chose to not identify them in the Budget Bill.

made by this act, does not itself appropriate any moneys, *and is not itself an item of appropriation*." (Stats. 2010, ch. 712, § 3.00, italics added.)

■ We reject the argument. California Constitution, article XIII B, section 6, subdivision (b)(1) provides that "*for a mandate . . . the Legislature shall either appropriate, in the annual Budget Act, the full payable amount* that has not been previously paid, or suspend the operation of the mandate . . . ." (Italics added.) In other words, in order to perform its constitutional duty with respect to the Chapter 26.5 mandate (and each other mandate), the Legislature was *required to make an appropriation* of the full required amount or suspend the operation of the mandate. It is clear that the Legislature intended to follow the former course. It is also undisputed that $132,941,000 is the full amount which had to be appropriated with respect to this mandate, and is the amount which the Legislature intended to be allocated to it. That the Legislature did not use the language of a specific appropriation of $132,941,000 with respect to this mandate does not render the Legislature's act any less of an appropriation. Indeed, if it did not constitute an appropriation, the Legislature would have failed in its duty under article XIII B, section 6, subdivision (b)(1).

In arguing that the Governor's right to veto an appropriation is limited in this context by California Constitution, article XIII B, section 6, subdivision (b)(1), petitioners raise a parade of horribles, suggesting that if the Governor can *reduce* the appropriation, the Governor has a power which the Legislature lacks—that is, to choose an option other than fully funding the payment due on the mandate or suspending its operation. Even worse, they suggest that, since the law forbids the Governor from assigning a specific purpose to part of a lump-sum appropriation and vetoing that purpose, if the Governor was permitted to reduce the overall $216,336,000 mandate reimbursement appropriation, the result would simply be that *all* of the 22 mandates to which it applied would be under-reimbursed, in contrast to the specific command of article XIII B, section 6, subdivision (b)(1).

■ Far from proving petitioners' point, however, these arguments instead demonstrate why, despite the language used by the Legislature in the Budget Bill, it made a $132,941,000 appropriation for reimbursement payments with respect to the Chapter 26.5 mandate. The Legislature could not simply make a lump-sum appropriation of $216,336,000 (or any other amount) for "mandate reimbursement" and leave it to the Controller to determine which mandates were to be reimbursed, and in what amounts. The Legislature was constitutionally required to make a choice, with respect to each mandate, between an appropriation of the full reimbursement payment due or nothing at all. It did so, choosing to make the appropriation. The Legislature cannot

shield an appropriation from the Governor's veto simply by not using the language of an appropriation in the Budget Bill. (*St. John's Well Child & Family Center v. Schwarzenegger, supra*, 50 Cal.4th at p. 983.) This is particularly true when, as here, the Constitution requires that the Legislature choose between a full appropriation of a specific amount, or nothing at all. As the Legislature chose to fully appropriate the specific amount of reimbursement for the Chapter 26.5 mandate, an appropriation was made. The appropriation was therefore subject to the Governor's veto,[18] unless the Governor was otherwise prohibited from exercising his veto in this context. We now turn to that issue.

### 3. Article XIII B, Section 6, Does Not Give the Legislature Exclusive Jurisdiction Over the Decision to Appropriate Reimbursement Funds for a Mandate

Petitioners' main argument against the Governor's exercise of the veto power is that California Constitution, article XIII B, section 6, subdivision (b), as added by Proposition 1A, vests *sole* discretion in determining whether to fund a mandate's reimbursement in the Legislature. The key language is as follows: "for a mandate for which the costs of a local government claimant have been determined in a preceding fiscal year to be payable by the State pursuant to law, *the Legislature* shall either appropriate, in the annual Budget Act, the full payable amount that has not been previously paid, or suspend the operation of the mandate for the fiscal year for which the annual Budget Act is applicable in a manner prescribed by law." (Cal. Const., art. XIII B, § 6, subd. (b)(1), italics added.) Petitioners argue that the plain language of the provision means that the Legislature alone has discretion to either make the necessary appropriation or suspend the mandate. Had the voters sought to permit the Governor to exercise his veto, they argue, the language would have instead read, "*the state* shall either appropriate . . . ." (Italics added.)

We are, therefore, called upon to determine whether the use of the words "the Legislature" in Proposition 1A was intended to mean the Legislature acting alone, or whether it was intended to refer to the Legislature enacting statutes subject to the Governor's veto, as generally provided in the Constitution. "When construing a constitutional provision enacted by initiative, the intent of the voters is the paramount consideration. [Citation.] To determine that intent, we look first to the provision's language, giving the words their ordinary meaning. [Citation.] If the language is clear and its meaning in relation to the problem at hand is manifest, ordinarily there is no

---

[18] As the Governor made the decision to eliminate the mandate appropriation in full, we need not address the situation that would arise if the Governor instead had attempted to reduce the appropriation by less than the entire amount.

need to search further for the provision's proper interpretation. [Citation.]" (*Davis v. City of Berkeley* (1990) 51 Cal.3d 227, 234 [272 Cal.Rptr. 139, 794 P.2d 897].) "If the language is ambiguous, however, we turn to extrinsic evidence, such as ballot arguments." (*California School Boards Assn. v. State of California* (2009) 171 Cal.App.4th 1183, 1206 [90 Cal.Rptr.3d 501].)

 Here, the language is reasonably susceptible of both meanings. While the use of the term "the Legislature" could mean "the Legislature acting exclusively," it could also mean "the Legislature acting as otherwise permitted by the Constitution." Indeed, petitioners' interpretation of California Constitution, article XIII B, section 6, subdivision (b)(1) would put it in direct conflict with the Governor's line-item veto power of California Constitution, article IV, section 10, subdivision (e). The law shuns repeal by implication; thus, we are bound to harmonize constitutional provisions that are claimed to stand in conflict. (*Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 249–250 [279 Cal.Rptr. 325, 806 P.2d 1360].) As such, the interpretation of "the Legislature" which encompasses, rather than forbids, the Governor's veto power is necessarily a reasonable one, and the use of "the Legislature" in article XIII B, section 6, subdivision (b)(1) is therefore ambiguous.[19] Thus, we turn to extrinsic evidence.

We have taken judicial notice of both the ballot pamphlet regarding Proposition 1A, and excerpts from the legislative history of the bill which placed it on the ballot. Neither one, at any point, suggests that, under the proposed constitutional amendment, the Legislature's decision to appropriate reimbursement funding for a mandate would be exempt from the Governor's power of veto. There is no indication that the initiative would require the Legislature, acting alone, to decide whether to fund or suspend each mandate. In contrast, the ballot pamphlet, no less than three times, states that the initiative would require "the state" to fund or suspend the mandate. The Attorney General's "Official Title and Summary" section explains that the initiative, "[r]equires the State to fund legislative mandates on local governments or suspend their operation." (Voter Information Guide, Gen. Elec. (Nov. 2, 2004) official title and summary of Prop. 1A, p. 4.) The analysis by

---

[19] Several cases have found the use of the term "the Legislature" in constitutional provisions to be ambiguous; the issue in these cases was whether power given to "the Legislature" could also be exercised by the electorate acting by initiative. (*Independent Energy Producers Assn. v. McPherson* (2006) 38 Cal.4th 1020, 1033 [44 Cal.Rptr.3d 644, 136 P.3d 178]; *Kennedy Wholesale, Inc. v. State Bd. of Equalization, supra,* 53 Cal.3d at p. 250; *State Comp. Ins. Fund v. State Bd. of Equalization* (1993) 14 Cal.App.4th 1295, 1299–1300 [18 Cal.Rptr.2d 526]; but see *California School Boards Assn. v. State of California, supra,* 171 Cal.App.4th at p. 1206 [provision of Cal. Const., art. XIII B, § 6 providing for subventions of funds to reimburse for mandates created by " 'the Legislature or any state agency' " unambiguously does not include mandates created by initiative].)

the Legislative Analyst provides that, "the measure requires the state to either fully fund each mandate . . . or suspend the mandate's requirements for the fiscal year." (Voter Information Guide, Gen. Elec. (Nov. 2, 2004) analysis of Prop. 1A by Legis. Analyst, p. 6.) In a sidebar box comparing Proposition 1A with Proposition 65, the Legislative Analyst states that, under Proposition 1A, "[i]f the state does not fund a mandate in any year, the state must eliminate local government's duty to implement it for that same time period." (Voter Information Guide, Gen. Elec. (Nov. 2, 2004) analysis of Prop. 1A by Legis. Analyst, p. 7.) It is apparent that the voters approved Proposition 1A with the understanding that it would require "the state" to either fund or suspend a mandate. The initiative was presented to the voters as a limit on the state's ability to mandate that local governments perform services without reimbursement, not as an exclusive grant of power to the Legislature to appropriate mandate reimbursement funds free from the "check" of a gubernatorial veto.

■ As the ballot pamphlet argument thrice refers to the key language as limiting the power of "the state," not "the Legislature," and the ballot pamphlet argument *nowhere* suggests that the language would allow the Legislature to act in derogation of the constitutional provisions regarding the Governor's power of veto, we conclude that the voters did not intend the term "the Legislature" to mean the Legislature acting exclusively. Instead, "the Legislature," as referenced in California Constitution, article XIII B, section 6, subdivision (b)(1), means "the Legislature" enacting laws as otherwise provided in the Constitution, including being subject to the Governor's veto.

### 4. The Governor's Veto of a Mandate Reimbursement Appropriation Does Not Constitute a Substantive Legislative Act

Petitioners' final argument is that the Governor's veto of the Chapter 26.5 mandate reimbursement appropriation cannot be separated from the substantive act of determining to suspend the mandate, and the latter is a policy decision which cannot be made by means of an appropriation veto. We turn to the language of the controlling law.

■ California Constitution, article XIII B, section 6, subdivision (b)(1) requires the Legislature to either appropriate the full payable amount "or suspend the operation of the mandate for the fiscal year for which the annual Budget Act is applicable in a manner prescribed by law." The parties agree that a "manner prescribed by law" for suspending the operation of the mandate includes[20] the manner prescribed in Government Code section 17581,

---

[20] Presumably, the Legislature could also suspend the operation of a mandate by a separately enacted statute.

subdivision (a). That statute does not specifically use language of "suspending" a mandate. Instead, it provides that no local agency shall be required to implement a mandate if it "has been specifically identified by the Legislature[21] in the Budget Act for the fiscal year as being one for which reimbursement is not provided for that fiscal year." The statute goes on to provide, "For purposes of this paragraph, a mandate shall be considered to have been specifically identified by the Legislature only if it has been included within the schedule of reimbursable mandates shown in the Budget Act and it is specifically identified in the language of a provision of the item providing the appropriation for mandate reimbursements." In other words, a local agency is not exempted from implementing a mandate if the mandate is simply *omitted* from the Budget Act. Instead, the mandate must be "specifically identified" in the schedule of reimbursable mandates and have an appropriation of zero.

Combining Government Code section 17581, subdivision (a) with California Constitution, article XIII B, section 6, subdivision (b)(1) results in the conclusion that for every mandate, the Legislature shall either appropriate the full reimbursement amount, or suspend the operation of the mandate *by means of specifically appropriating an amount of zero.*[22] Petitioners argue that while the Governor may generally be permitted to reduce, or even eliminate, a line-item appropriation, the Governor may not enact substantive law by means of such a veto, and, here, the elimination of the appropriation is inextricably intertwined with the substantive decision to suspend the operation of the mandate. The only solution to the problem, according to petitioners, is to preclude the Governor from exercising his veto in this situation.

We disagree. If petitioners are correct and a zero mandate reimbursement appropriation constitutes an act of substantive law, it is not only the Governor's veto that would be unconstitutional, but Government Code section 17581 itself. Substantive law cannot be made in a budget bill. "Budget bills that substantively change existing law violate the single-subject rule." (*San Joaquin Helicopters v. Department of Forestry* (2003) 110 Cal.App.4th 1549, 1558 [3 Cal.Rptr.3d 246].) The reason for this is apparent: a substantive bill

---

[21] Any suggestion that the reference to "the Legislature" in this statute is an exclusive grant of power to the Legislature which exempts acts taken by the Legislature pursuant to this statute from the Governor's veto is without merit. We will not interpret a statute to suspend the operation of the Constitution sub silentio. While the Legislature initially identifies appropriations in the Budget *Bill*, the Budget *Bill* does not become the Budget *Act* without the Governor's approval (or a veto override). If Government Code section 17581 is interpreted to provide that the Legislature's placement of a line item in the Budget Bill has any legal effect regardless of subsequent action taken by the Governor, the statute itself would work an amendment to the provisions of the California Constitution. The statute, however, is not a constitutional amendment. (See Cal. Const., art. XVIII.)

[22] This is precisely the course taken by the Legislature with respect to 53 other mandates. (See fn. 9, *ante.*)

making a change to existing law can be vetoed in its entirety by the Governor. (Cal. Const., art. IV, § 10, subd. (a).) Incorporating such a bill into a budget bill violates the single-subject rule and makes it impossible for the Governor to properly exercise his veto. (Cf. *Harbor v. Deukmejian, supra,* 43 Cal.3d at p. 1100 [a "trailer" bill intended to make multiple changes to substantive law relating to fiscal matters addressed in the budget bill violates the single-subject rule].)

Thus, if making an appropriation in the annual budget act of zero dollars in connection with a mandate reimbursement is, in fact, a *substantive* suspension of the mandate, then the Legislature is forbidden from making such an appropriation in the budget act, and Government Code section 17581, subdivision (a), which permits the Legislature to do so, is an unconstitutional invitation to violate the single-subject rule. (Cal. Const., art. IV, § 9.) Alternatively, if making an appropriation of zero dollars is *not* a substantive act but is simply an act of nonappropriation, which, *by operation of* Government Code section 17581, has the automatic legal effect of freeing local agencies from the obligation to implement the mandate for that year, the statute is constitutional.

■ We choose the interpretation which renders the law constitutional. (*San Joaquin Helicopters v. Department of Forestry, supra,* 110 Cal.App.4th at p. 1559.) ■ Moreover, it is the interpretation which is in accordance with the plain language of Government Code section 17581, which does not speak of the Legislature "suspending" a mandate by means of a zero appropriation,[23] but rather states that *if* the Legislature makes a zero appropriation, *then* the local agencies are not required to implement the mandate.

In this case, the Legislature did not make a zero appropriation for the Chapter 26.5 mandate. The Legislature attempted to appropriate the full reimbursement amount necessary, and the Governor exercised his line-item veto to eliminate that appropriation, as was his constitutional right. The result is a zero appropriation which, under Government Code section 17581, has the effect of freeing local agencies from the duty to implement the mandate. The Governor's exercise of his veto was not an act of substantive lawmaking; the veto simply has a substantive effect, due to the operation of a previously enacted statute.

---

[23] California Constitution, article XIII B, section 6, subdivision (b)(1) *does* speak in terms of "suspend[ing] the operation of the mandate . . . in a manner prescribed by law." We do not interpret this language to imply that the Legislature may enact substantive law in the budget bill in this limited circumstance. First, the "in a manner prescribed by law" language suggests that this provision was not intended to broaden legislative powers beyond their current limits. Second, and more important, as discussed above, we interpret the use of "the Legislature" in this provision as meaning "the Legislature acting pursuant to the usual constitutional limitations on its power."

## DISPOSITION

The petition is denied. The parties are to bear their own costs.

Klein, P. J., and Aldrich, J., concurred.

Petitioners' petition for review by the Supreme Court was denied June 8, 2011, S191952.